**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CPS MED MANAGEMENT LLC f/k/a MCKESSON MEDICATION MANAGEMENT, LLC, | Civil Action No. 2:09-cv-4572 |
| Plaintiff, | |
| v. | |
| BERGEN REGIONAL MEDICAL CENTER, L.P., Defendant. | |
| CPS MED MANAGEMENT LLC, | |
| Third Party Plaintiff, | |
| v. | |
| McKESSON CORPORATION, | |
| Third Party Defendant. | |

---

**DEFENDANT BERGEN REGIONAL MEDICAL CENTER'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

Anthony Argiropoulos, Esq.
Andrew W. Schwartz, Esq.
SILLS CUMMIS & GROSS P.C.
650 College Road East
Princeton, New Jersey 08540
Tel. (609) 227-4600
Fax (609) 227-4646
Attorneys for Defendant
Bergen Regional Medical Center

Table of Contents

Page

PRELIMINARY STATEMENT.......................................... 1

STATEMENT OF FACTS............................................. 3

   A.  Background On The Hospital................................ 3

   B.  MMM's Proposal........................................... 4

   C.  The Pharmacy Services Agreement.......................... 8

   D.  MMM Failed To Deliver On Its Promises................... 11

LEGAL ARGUMENT............................................... 13

      I.   Summary Judgment Should Be Granted On The
           Hospital's  Counterclaim.......................... 13

      II.  MMM Materially Breached the Agreement by Failing
           to Deliver Promised Savings to the Hospital
           (Count I)........................................ 14

      III. MMM Breached the Implied Duty of Good Faith and
           Fair Dealing Implied In the Agreement by Failing
           to Deliver the Promised Savings and Disclaiming
           that Savings Were Part of the Agreement (Count
           III) ............................................ 21

      IV.  MMM Breached The Agreement By Failing To Properly
           Manage The Pharmacy (Count I)...................... 21

      A.   MMM Breached The Agreement By Failing To Properly
           Adjudicate Claims................................. 21

      B.   MMM Breached The Agreement By Failing To Enroll
           The Hospital In The Government's Discount Drug
           Program – 340B PVP................................ 25

      C.   MMM Breached The Agreement By Failing To Properly
           Manage The Pharmacy's Inventory.................... 28

      D.   MMM Fraudulently Induced The Hospital To Enter
           Into The Agreement with Promises of Savings that
           it Never Intended to Deliver. (Count IV).......... 33

   CONCLUSION............................................... 38

i

**TABLE OF AUTHORITIES**

CASES                                                                    PAGE(S)

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 ............................................14

Banco Popular N. Am. v. Gandi,
    184 N.J. 161 (2005) ..................................36, 39

Bell Atl. Network Serv., Inc. v. P.M. Video Corp.,
    322 N.J. Super. 74 (App. Div. 1999) .........................36

Celotex Corp. v. Catrett,
    477 U.S. 317 ............................................14

Chrisomalis v. Chrisomalis,
    260 N.J. Super. 50 (App. Div. 1992) .........................37

Conway v. 287 Corporate Center Assoc.,
    187 N.J. 259 (2006) ..................................15, 16

Iliadis v. Wal-Mart Stores, Inc.,
    191 N.J. 88 (2007) .........................................25

Kelly v. Berlin,
    300 N.J. Super. 256 (App. Div. 1997) ..................25, 30

Ocean Cape Hotel Corp. v. Masefield Corp.,
    63 N.J. Super. 369 (App. Div. 1960) .........................37

Overland Leasing Group, LLC v. First Fin. Corporate Servs.,
    Docket No. 2:06-cv-058502009, U.S. Dist. LEXIS 118296
    (D.N.J. Dec. 18, 2009) ....................................13

Palisades Props., Inc. v. Brunetti,
    44 N.J. 117 (1965) ...................................22, 23

Sons of Thunder v. Borden, Inc.,
    148 N.J. 396 (1997) .......................................21

Stochastic Decisions, Inc. v. DiDomenico,
    236 N.J. Super. 388 (App. Div. 1989) .......................37

Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.,
    357 F. Supp. 2d 788 (D.N.J. 2005) .........................40

V.A.L. Floors,Inc. v. Westminster Communities, Inc.
   355 N.J. Super 416 (App. Div. 2002) .........................26

Van Dam Egg Co. v. Allendale Farms, Inc.,
   199 N.J. Super. 452 (App. Div. 1985) .......................37

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c).......................................14

Rule 26(a)..................................................39

Rule 30(b)(6)......................................26, 38, 39

## PRELIMINARY STATEMENT

In a Pharmaceutical Services Agreement dated March 23, 2007 (the "Agreement"), Bergen Regional Medical Center (the "Hospital") retained McKesson Medication Management LLC ("MMM") to manage and operate the Hospital's pharmacy (the "Pharmacy"). The Hospital retained MMM because MMM promised that it would provide these services "for the benefit of the Hospital" and that in so doing the Hospital would realize "real dollar" savings of approximately $7 million.  To quote MMM, "no matter how you slice and dice the savings calculation **this is hugely significant."**

However, MMM, which was later acquired and renamed CPS Med Management, LLC ("CPS"), flat out failed to deliver.  In addition to failing to deliver savings, MMM failed to deliver the level of services that the Hospital expected.  On top of the lost savings, MMM's mismanagement of the Pharmacy cost the Hospital over one million dollars.

MMM has attempted to distance itself from these fundamental failures by asserting that the promise of savings, which was the integral part of the parties' expectations of the Agreement, was not an express term in the Agreement.  It does not have to be. The savings promise not only formed (expressly) the framework of the parties' reasonable expectations, but it was contained in the December 9, 2005 Proposal that led up to Agreement and that

was incorporated by the Agreement.  MMM effectively admits this through the deposition testimony of its representatives.

MMM cannot run from its own admissions about the December 9 Proposal.  Nor can MMM run from the Hospital's reasonable expectation for the savings that are laid out in that proposal. MMM's conduct makes clear that the proposal formed part of the Agreement.  In particular, MMM provided to the Hospital various specific services that were not mentioned at all in the Agreement, **but which were expressly included in the December 9 proposal.**  Tellingly, MMM included these services within the agreed upon monthly fee for services set forth in the Agreement. Furthermore, MMM promised to provide to the Hospital very specific services that are not defined in the Agreement, but rather, are specifically set forth and defined in the December 9 Proposal.  Therefore, the December 9 Proposal is both interpretive of the Agreement as well as part and parcel of the Agreement.

The promise of savings is "hugely significant" to the Hopital's breach of contract claim as it is "hugely significant to the Hospital's claim that MMM's promise of massive "real dollar" savings fraudulently induced the Hospital to enter into a contract with MMM.

For the reasons set forth herein, the Court should grant summary judgment in favor of the Hospital and against MMM.

- 2 -

## <u>STATEMENT OF FACTS</u>

**A.    Background On The Hospital.**

The Hospital is a behavioral health, long term care and acute general care hospital situated in Paramus, New Jersey.  It has 1070 beds, divided as follows:  acute care (176), behavioral health (323), long-term care (570).  <u>See</u> Certification of Susan Mendelowitz, dated November 9, 2011 ("Mendelowitz Cert."), ¶ 3. The Hospital's patient population is comprised largely of charity care patients who are uninsured.  As a result, the majority of the Hospital's reimbursement for services comes from government programs (Medicare/Medicaid) and charity.  <u>Id</u>., ¶4. With charity care funding decreasing each year, cost containment is critical to the Hospital.  <u>Id</u>.

This case involves the operation of the Department of Pharmaceutical Services (<u>i.e.</u>, the Pharmacy) by MMM and its successor CPS.  The Pharmacy is broken down into two units:  an inpatient pharmacy (the "IP Pharmacy") and an outpatient pharmacy (the "OP Pharmacy").  <u>Id</u>., ¶5.  The IP Pharmacy dispenses medications to patients admitted to the Hospital for care.  The OP Pharmacy operates similar to a corner drugstore for the issuance of prescriptions, such as CVS, or Rite Aid dispensing medications to outpatients.[1]  <u>Id</u>.

---

[1] The LTC facility had a pharmacy that is not at issue here.

For a period of years ending in May 2006, CPS operated the Pharmacy pursuant to a contract with the Hospital.  <u>Id</u>., ¶6. However, the Hospital was not satisfied with the level of service provided by CPS and, in 2005, it commenced a search for another operator of the Pharmacy.  <u>Id</u>.  At the time, the Hospital believed that it lacked sufficient expertise to operate the Pharmacy internally.  It thus sought an outside expert in pharmacy management to replace CPS.  <u>Id</u>., ¶8.

**B.   MMM's Proposal.**

In or about September of 2005, Susan Mendelowitz, the Hospital's COO, contacted MMM and asked that it provide a proposal to lead, manage and operate the Pharmacy.  <u>Id</u>.  At the time, MMM had a good reputation as an expert in operating hospital based pharmacies.  <u>Id</u>.  At MMM's request, on November 16-17, 2005, it conducted a comprehensive assessment and audit of the Pharmacy including an analysis of the Hospital's financial records related to the Pharmacy <u>Id</u>. at 10.

The culmination of MMM's comprehensive assessment and audit was a presentation by MMM to the Hospital on December 7, 2005. The presentation was made by Kendra Grant, the Regional Vice-President of Development Areas for MMM.  <u>See</u> Ex. A to Mendelowitz Cert. (the "December 7 Proposal").  MMM represented to the Hospital, among other things, that

- MMM would significantly reduce the Hospital's Pharmacy expenses, optimize inventory and manage the purchasing and inventory system and introduce other programs that will "be a building block" for "cost reduction for many years to come."

- MMM had "industry leading resources and experts" and deep experience and expertise to in the field of pharmacy management, including but not limited to its ability to deliver cost savings and lower costs.

- MMM would provide three key benefits to the Hospital: "[l]owering costs, operational efficiency and enhancing patient safety."

- MMM also represented that it had significant relationships and buying power with drug manufacturers and distributors which would permit the Hospital to purchase pharmaceutical drugs for the lowest possible price on the market.

- MMM further represented to the Hospital that it could avail itself to the Purchasing Alliance for Clinical Therapeutics (PACT) purchasing portfolio.  MMM claimed that the PACT purchasing portfolio was the source for the least expensive drugs, and that through the PACT purchasing portfolio, the Hospital's purchasing costs would be the lowest possible in the market.  CPS/McKesson also represented that it would and could obtain the lowest cost drugs for the Hospital.

See Mendelowitz Cert., ¶12 and Ex. A, at 3, 21, 25, 28.  MMM's

many representations to the Hospital concerning MMM's pharmacy

expert management culminated in a promise that, by engaging MMM

to manage/operate the Pharmacy, the Hospital would save almost

seven million dollars ($7,000,000) over a three year period.

Id., at ¶13; Ex. A, at 10.  Specifically, MMM expressly promised

to provide the Hospital with savings of $6,931,694.  Id., ¶13;

Ex. A, at 10.

Two days after its initial proposal, on December 9, MMM
provided the Hospital with an updated proposal.  See Exhibit A
to the Certification of Anthony Argiropoulos, dated November 10,
2011 ("Argiropoulos Cert.") (the "December 9 Proposal").  This
time, MMM represented and promised additional savings as
follows:

- Savings in year one of $1,526,149

- Savings in year two of $2,324,983

- Savings in year three of $3,094,945.

Id, at 10.

The next week, Ms. Grant again reiterated the promised
savings in critical email to Ms. Mendelowitz.  See Mendelowitz
Cert., Ex. B.  The context of the e-mail is important.  While
MMM was "selling the contract"[2] to the Hospital, CPS was making
proposals to continue providing Pharmacy Management services.
Ms. Mendelowitz questioned whether MMM planned to provide the
necessary improvements for the Hospital to upgrade its IV mixing
room to ensure regulatory compliance – CPS was offering to
provide $72,000 in renovations as part of its latest proposal to
continue operating the Pharmacy.  See Mendelowitz Cert., ¶14.
MMM, through Ms. Grant, responded:

---

[2] Ms. Grant characterized it this way.  See Ex. B to Argiropoulos
Cert., Deposition Transcript of Kendra Grant, dated March 17,
2011 ("Grant Dep."), at 18:21-18:23, 19:23-20:4.

> **We are offering to bring you $1.5M in savings** and no matter how you slice and dice the savings calculation **this is hugely significant.**

Id., Ex. B (emphasis added).  Ms. Grant went on to state that MMM intended to allocate "the appropriate amount of dollars from the drug spend savings" for this purpose.  Id.

MMM knew that the Hospital relied upon and expected the savings that MMM (and Ms. Grant) repeatedly promised. At her deposition, Ms. Grant testified:

> Q.   So during that time period, did you ever come to believe that Bergen Regional Medical Center expected that it would enjoy savings as a result of contracting with McKesson Medication Management?
>
> A    Yes.
>
> *    *    *
>
> Q    And how did you come to that belief?
>
> A    Through discussions with the client.  This was a proposal I gave them.  I believed in this proposal, and they signed a contract with us.

See Argiropoulos Cert., Ex. B, Grant Dep. 82:12-83:24.

MMM's promise of these savings, and the Hospital's expectations, are also reflected in MMM's internal documents provided in discovery.  An MMM internal document reflects that as of March 1, 2006 MMM projected savings to the Hospital in the first year of $1,572,713 (an additional $46,564 in savings).  See Argiropoulos Cert., Ex. C. at CPS 2389.

**C.    The Pharmacy Services Agreement.**

The Hospital received proposals from both CPS and MMM.  In the end, MMM's promise to save the Hospital $7 million swayed the Hospital's decision to hire MMM to manage/operate the Pharmacy.  See Mendelowitz Cert., ¶¶ 16, 17.  And so, following MMM's proposal and promises of savings, the Agreement was signed on or about March 23, 2006.  See Mendelowitz Cert., Ex. C.  The Agreement required MMM to provide to the Hospital certain "consulting services, pharmaceutical services, pharmacy administration and management support services" for the benefit of the Hospital.  Id., at 1.

Pursuant to the Agreement, in exchange for a monthly management fee, and expressly "[f]or the benefit of the Hospital," MMM agreed to be responsible for the operation and management of the Pharmacy and

- to develop Pharmacy policies and procedures that would decrease the Hospital's Pharmacy costs;

- to purchase and maintain the Hospital's drug inventory at the lowest available cost;

- to conduct in-service educational services to Hospital committees and staff;

- to provide the Hospital with specific drug utilization data in order to allow for patient billing;

- to ensure that full and complete pharmacy records and charts are prepared and maintained by the Pharmacy in compliance with all Federal and State laws, rules and

regulations and applicable standards of accrediting
agencies of the Hospital;

- to ensure all pharmacy patient records and charts
conform to good pharmacy practice so as to permit
patient care and quality review;

- to ensure that there are accurate, daily records of
all services and items provided by the Pharmacy to
Hospital patients; and

- to be responsible for and supervise all Pharmacy
employees, including but not limited to Pharmacy
directors, pharmacists, technicians or other
employees.

Id., at 1-3.  However, this was not all.

Other services that MMM provided, and which were included
in the monthly management fee are set forth specifically in
MMM's "Scope of Services" in the December 9 Proposal even though
there is no express reference to these services or to the
December 9 Proposal in the Agreement.   These were:

- Provide sufficient implementation and interim
staffing resources to complete all transition
activities sand commence operation on or before
January 01, 2005. See Argiropoulos Cert. Ex. D,
Deposition Transcript of Marcia Gutfeld, dated March
23, 2011 ("Gutfeld Dep."),at 54:17 – 55:17.

- Participate in BRMC's Medication Usage and infection
Control Committee.  See Gutfeld Dep. 57:21-58:6)

- Implement and enforce policies and employment
practices that comply with the provisions of all
applicable state, and federal civil rights laws
including the prohibition of discrimination practices
sexual harassment.  See Gutfeld Dep. 68:12-70:12.

- Complete monthly inspections of areas where
pharmaceuticals are stored.  See Gutfeld Dep. 73:1-
73:5.

- Maintain a formulary management program continuous drug interaction monitoring and adverse drug reaction program.  See Gutfeld Dep., 73:23-74:3.

- Provide Comprehensive Management of the Medication Use Process.  See Gutfeld Dep. 80:4-80:14.

- Drug utilization management, formulary design and implementation.  See Gutfeld Dep. 81:11-81:25.

- Safety protocols: ABE& Medication error reduction. See Gutfeld Dep. 88:13-88:16.

- New agent and new use drug tracking, protocol development and medical staff training.  See Gutfeld Dep. 88:23-89:16.

- Scheduled quarterly business reviews and progress reviews including Monthly Management Report.  See Gutfeld Dep. 97:8-98:4.

- MMM would work with BRMC to narrow any identified performance or expectations gap to further achieve clinical outcomes or financial performance.  See Gutfeld Dep. 97:8-98:4.

- Monthly management report.  See Gutfeld Dep. 99:14-99:19 and 118:25-119:5.

- Action plan to be developed to indentify needs and gaps and resources required to enhance or satisfy the needs.  See Gutfeld Dep. 100:15-100:21.

- Regional resources to include regional vice president, regional director of finance, regional clinical consultant and regional human resources manager.  See Gutfeld Dep. 101:2-101:10.

- Purchasing compliance reports.  See Gutfeld Dep. 102:10-102:14.

- Clinical pharmacy plan progress report.  See Gutfeld Dep. 109:1-109:6.

- ADR/medication error report.  See Gutfeld Dep. 109:17-109:21.

When asked about the charges for these services, Ms. Gutfield
testified as follows:

> Q.   All of these services that you just described for
>      me that were provided by McKesson Medication
>      Management to Bergen Regional Medical Center that
>      we just went over, on these last two pages [of
>      the December 7 Proposal], was a charge for those
>      services included in the monthly invoice that you
>      described?
>
> A.   There wasn't a charge for those individuals
>      services, they were part of the management
>      agreement.

See Gutfeld Dep., at 111:1-9.

The term of the Agreement ran from May 1, 2006 through
April 30, 2009, subject to certain renewal and termination
provisions.

**D.   MMM Failed To Deliver On Its Promises.**

The Hospital does not dispute that MMM adequately provided
some of the basic services required under the Agreement.   See
Mendelowitz Cert., ¶20.  However, MMM utterly failed to deliver
the promised cost savings.  Further, MMM failed to minimize the
Hospital's drug spend, and it failed to perform or provide
management services at the level that was promised and expected.

The extent MMM's failure to deliver on its promises was not
discovered until mid-2007.  In or about 2007, the Hospital
engaged the services of VIE Healthcare to conduct a complete
audit of all departments within the Hospital.  VIE's particular

focus was on efficient and cost-effective operation of the
Hospital.  <u>See</u> Mendelowitz Cert., ¶23.

Among other things, VIE discovered:

- MMM failed to enroll the Hospital in the 340B Prime
  Vendor Program ("340B PVP");

- MMM failed to properly manage inventory in the
  Pharmacy;

- MMM failed to properly manage expiring
  pharmaceuticals; and

- MMM failed to order the least expensive available
  pharmaceuticals.

<u>See</u>, <u>generally</u>, Mendelowitz Cert., Ex. F **(July 3, 2008 letter)**.
Apart from VIE's findings, the Hospital itself discovered that:
(a) MMM was overcharging for travel expenses; and (b) MMM had
failed to properly adjudicate claims.

These issues were presented to MMM in a series of letters
from the Hospital to Ms. Gutfeld, who was MMM's Regional Vice-
President in charge of its operations at the Hospital.  <u>See</u>
Mendelowitz Cert., Exs. D, E, F.  By letter dated April 11,
2008, the Hospital exercised its contractual right under the
Agreement and provided MMM with a formal notice of default and
provided MMM with 30 days in which to cure.  <u>See</u> Ex. D, at 3.
The Hospital extended the deadline to cure on several occasions
while the parties exchanged information.  However, MMM never
satisfactorily accounted for its misrepresentations and breaches
of the Agreement.  MMM at no time agreed to provide the Hospital

with any compensation for its losses caused by MMM.  <u>See</u> Mendelowitz Cert., ¶31.  Indeed, rather than save the Hospital $7 million over three years, the Hospital's contract with MMM cost the Hospital more than $1 million.

Therefore, by letter dated August 22, 2008, the Hospital provided MMM with 90 day notice of termination without cause, under Article 4.2 of the Agreement.  <u>See</u> Mendelowitz Cert., Ex. G.  Further, in light of MMM's failure to cure its defaults, by letter dated November 4, 2008, the Hospital provided MMM with 30 days notice of termination for cause, pursuant to Article 4.2 of the Agreement.  <u>See</u> Mendelowitz Cert., Ex. H.

MMM's operation of the Pharmacy ceased on December 4, 2008. <u>See</u> Mendelowitz Cert., ¶30.

<u>**LEGAL ARGUMENT**</u>

**I.    Summary Judgment Should Be Granted On The Hospital's Counterclaim Because There Are No Disputed Issues Of Material Fact.**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  <u>Overland Leasing Group, LLC v. First Fin. Corporate Servs.</u>, Docket No. 2:06-cv-05850, 2009 U.S. Dist. LEXIS 118296,

12-13 (D.N.J. Dec. 18, 2009).  A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248(1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 318(1986).

## II. MMM Materially Breached the Agreement by Failing to Deliver Promised Savings to the Hospital.

MMM promised that the Hospital would save $7 million if it agreed to retain MMM to operate the Hospital's pharmacy.  See Mendelowitz Cert., ¶13; Ex. A, at 10.  The promised savings was a material component of the Agreement, and it is the "positive benefit" or "change" that is implied and meant by MMM's obligations to perform pharmaceutical services "for the benefit of the Hospital."  MMM failed to deliver the savings, and this is a material breach of the Agreement.

The absence of an express savings provision is not at all fatal to the Hospital's breach of contract claim.  Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement.  This is so even when a contract on its face is free from ambiguity.  Conway v. 287

- 14 -

Corporate Center Assoc., 187 N.J. 259, 269 (2006) (quoting Atl.
Ne. Airlines v. Schwimmer, 12 N.J. 293, 301-02 (1953)).  "The
polestar of construction is the intention of the parties to the
contract as revealed by the language used, taken as an entirety;
and, in the quest for the intention, the situation of the
parties, the attendant circumstances, **and the objects they were
thereby striving to attain are necessarily to be regarded**."  Id.
(emphasis added).  The Court's interpretive function is to
consider the written contract's terms "in the context of the
circumstances under which it was written, and accord to the
language a rational meaning in keeping with the expressed
general purpose."  Id.  "Such evidence may include consideration
of the particular contractual provision, an overview of all the
terms, the circumstances leading up to the formation of the
contract, custom, usage, and the interpretation placed on the
disputed terms by the parties' conduct."  Id. (quoting Kearny
PBA Local #21 v. Town of Kearny, 81 N.J. 208, 221 (1979)).

    In this case, MMM agreed to provide services "**for the
benefit of the Hospital**."  See Mendelowitz Cert., Ex. C,
Agreement, at §1.  This unique obligation is distinguishable
from any services that "MMM provides **to and on behalf of** medical
facilities such as hospitals, health systems, nursing homes and
hospice providers."  Id., §§ B and C.  MMM concedes that
providing services "for the benefit of the Hospital" means MMM's

services "will be performed in a positive manner so there will be ultimately be some benefit, positive change in processes or systems [for the Hospital] . . . [and] in the best interest of the Hospital." See Argiropoulos Cert., Ex. D, Gutfeld Dep. 139:13-19; 165:3-165:12.

In order for the Court to ascertain the benefit or positive change that the parties expected and intended, the Court must first look to the Agreement, and then to extrinsic evidence. Here, the Agreement appears silent. However, the December 9 Proposal which framed the Agreement clearly explains that this benefit was "the material savings opportunities through enhanced operational efficiencies, supply chain costs, inventory management savings and clinical programs." See Argiropoulos Cert., Ex. A, December 9 Proposal at 10. Specifically, MMM promised, and the Hospital expected that the MMM's services would provide the following benefit:

- Savings in year one of $1,526,149

- Savings in year two of $2,324,983

- Savings in year three of $3,094,945.

Id.[3]

---

[3] It is not surprising that MMM's financial summary of its deal with the Hospital referred to MMM's monthly management fee as and "investment fee" and the savings as the Hospital's "return." See Argiropoulos Cert., Ex. A, December 9 Proposal, Financial Summary, "Partnership Investment/Return."

MMM's testimony confirms that the savings form and frame the Agreement, and that savings are an expected and (at minimum) implied part and benefit of MMM's services.  Ms. Grant, who "sold the contract" to the Hospital testified:

> Q.   So during that time period, did you ever come to believe that Bergen Regional Medical Center expected that it would enjoy savings as a result of contracting with McKesson Medication Management?
>
> A    Yes.
>
> Q    And at any point during that time period, did you come to believe that they expected that they would receive savings along the lines of the numbers that you put into the proposal for years one, two, and three on page CPS 485 of the updated proposal?
>
> *    *    *
>
> A    Yes.
>
> Q    And how did you come to that belief?
>
> A    Through discussions with the client.  This was a proposal I gave them.  I believed in this proposal, and they signed a contract with us.

See Argiropoulos Cert., Ex. B, Grant Dep. 82:12-83:24.

MMM's savings promise was reinforced in other important communications as well.  Comparing MMM's proposed contract to a competitor, Ms. Grant wrote:

> We are offering to bring you $1.5M in savings and no matter how you slice and dice the savings calculation this is hugely significant.

Id., Ex. B (emphasis added).  At her deposition, Ms. Grant testified that she specifically referred to the "real dollar"

savings set forth in the proposal.  See Argiropoulos Cert, Ex.B, Grant Dep., 106:24 – 107:16.  It cannot be disputed that the parties expressly understood and intended that the December 9 Proposal's provisions concerning savings formed and framed the parties' intentions and expectations.

However, the December 9 Proposal does far more than just frame the Agreement and explain the parties' intentions and expectations: the Proposal itself sets forth the specific nature and scope of MMM's performance of pharmaceutical services – all of which were infused with the promise of savings.

At her deposition, Ms. Gutfeld testified that the agreed-upon scope included far more than just those items expressly set forth in Agreement, but rather all of the responsibilities and duties identified in MMM's "Scope of Services" set forth in the December 9 Proposal. See Argiropoulos Cert. Ex. D, Gutfeld Dep.,at 54:17–55:17; 57:21–58:6; 68:12–70:12; 73:1–73:5; 73:23–74:3; 80:4–80:14; 81:11–81:25; 88:13–88:16; 88:23–89:16; 97:8–98:4; 97:8–98:4; 99:14–99:19; 100:15–100:21; 101:2–101:10; 102:10–102:14; 109:1–109:6; 109:17–109:21; and 118:25–119:5. Furthermore, all of these services that are described in the December 9 Proposal – but which were not set forth in the Agreement – were charged as MMM's agreed upon services and within its monthly charge pursuant to the Agreement.  See id. at 111:1-9.

MMM's conduct places the December 9 Proposal squarely within the Agreement, but there is more.  The Agreement also refers to MMM's obligation to deliver certain services that are not defined in the Agreement.  Instead these services and obligations are defined within the December 9 Proposal or the documents that it incorporated from the December 7 Proposal. The Hospital offers two examples.

First, MMM promised to provide the following: "Pharmaceutical service[ ] for the benefit of the Hospital[:] MMM's Quality Assessment Process and Performance Improvement Program." See Mendelowitz Cert., Ex. C, Agreement, §1.1(l), at 1.  These terms are not defined in the Agreement's definitions or otherwise amplified in the Agreement.  In order to ascertain the nature of this obligation, the parties must refer to the December 7 Proposal, which incorporated the "Services and Resources" documents that were attached to the December 7 Proposal.  See Mendelowitz Cert., Ex. A. December 7 Proposal, at 15-16; 25-32.

Second, the same is true as to MMM's promises to use the "Purchasing Alliance for Clinical Therapeutics (PACT) purchasing portfolio."  See Mendelowitz Cert., Ex. C, Agreement, § 1.5(c), at 3.  "PACT" is an undefined term.  To understand it, the parties (and the Court) must again refer to "MMM's Services & resources" documents that are appended to the December 7

Proposal (which are incorporated by the December 9 Proposal).
See Mendelowitz Cert., Ex. A, December 7 Proposal, p. 28.

In sum, the December 9 Proposal was intended and understood
by the parties, both through their words (written and oral),
their acts, and their testimony to form part of the Agreement.
This includes MMM's promise of savings, upon which MMM (and CPS)
failed to deliver.

The Hospital has been damaged by this breach.  Rather than
deliver on the promised savings of $7 million (pro-rated to
$6,179,443 for the actual term of the service), MMM only
delivered savings of $4,660,574.  Thus, the Hospital has been
damaged in the amount of $1,518,869.  See Argiropoulos Cert.,
Ex. E.

Alternatively, MMM's material breach of the Agreement
should excuse the Hospital from its performance or obligations
pursuant to the Agreement.  Nolan v. Lee Ho, 120 N.J. 465, 472
(1990)(when one party commits a material breach of the contract,
the non-breaching party is excused from future performance).
Here, for example, MMM cannot be entitled to recover for any
amounts it claims to be due when it has so fundamentally
breached the Agreement by failing to deliver the savings and now
hiding from that obligation and the Hospital's reasonable
expectations.

### III. MMM Breached the Duty of Good Faith and Fair Dealing Implied In the Agreement by Failing to Deliver the Promised Savings and Disclaiming that Savings Were Part of the Agreement.

It is settled that "every contract in New Jersey contains an implied covenant of good faith and fair dealing." <u>Sons of Thunder v. Borden, Inc.</u>, 148 N.J. 396, 420 (1997). Specifically, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . . ." <u>Palisades Props., Inc. v. Brunetti</u>, 44 N.J. 117, 130 (1965) (<u>quoting</u> 5 Williston on Contracts § 670, pp. 159-160 (3d ed. 1961)).  Here, for the reasons set forth in Section II, <u>supra</u>, MMM and CPS have destroyed the Hospital's right to receive the fruit of the Agreement – namely the millions in savings that MMM promised.

### IV. MMM Breached The Agreement By Failing To Properly Manage The Pharmacy.

MMM breached the Agreement by failing to manage and operate the Pharmacy in the manner in which it represented, and it consequently caused the Hospital to suffer ever more damages.

#### A. MMM Breached The Agreement By Failing To Properly Adjudicate Claims.

Claims adjudication is the process by which the Pharmacy is paid for the medication it dispenses.  It involves filing a claim with third-party payors – including Medicare, Medicaid and

private insurers.   See Certification of Denise Schauble, dated November 9, 2011 ("Schauble Cert."), ¶ 6.  If a claim is not properly adjudicated, then the Hospital will not be paid for medication it dispenses.  Id., ¶7.  Claims adjudication starts with a basic premise:  if a claim is not approved, then the prescription should not be filled.  Id.  Under MMM's management, the outpatient pharmacy routinely disregarded this basic premise.

The Agreement requires MMM to adjudicate all claims for the outpatient pharmacy.  From the outset of the Agreement, claims adjudication fell within the scope of MMM's duties in managing the Pharmacy.  Id., ¶5.  To clarify MMM's obligations under the Agreement, on October 27, 2006, the parties entered into a written amendment to the Agreement that expressly states MMM's responsibilities to include:

> Oversee the billing function, on behalf of the hospital, for third party insurance carriers (including Medicaid) for services provided to patients in conformity with the usual and proper method required or accepted under the respective reimbursement or payment plans.

See Argiropoulos Cert., Ex. G, Amendment.  Thus, for the period from October 27, 2006 through the end of the contract, there is no dispute that MMM was responsible for claims adjudication in the Pharmacy – a responsibility it failed to properly undertake.

The implementation of Medicare Part D in 2006, which initiated prescription drug coverage for Medicare recipients, markedly changed the process of claims adjudication.  See Schauble Cert., ¶9.  All claims covered under Medicare Part D are required to be submitted electronically.  This provided a substantial benefit to the Hospital, which now received instantaneous notice of claim approval/denial.  Id., ¶10.  To facilitate the electronic submission of claims, the Hospital acquired the Pharmaserve software system from McKesson – which is the parent of MMM.  Id., ¶11.  It thus became Hospital policy that no prescription was to be filled by the outpatient pharmacy unless one of the following was true:  (1) a claim was approved, (2) the patient was approved for charity care, or (3) the patient paid cash for his prescription.

It was the responsibility of the outpatient pharmacy, under MMM's management, to submit and fully adjudicate claims to both government and third-party payors.  In practice, this should have enabled the Hospital to be compensated on nearly every prescription filled by the outpatient pharmacy.  Id., ¶12.  Further, even though it was against Hospital policy, the outpatient pharmacy routinely filled prescriptions despite the denial of claims.  Id., ¶15.

As a result of these failures, between July 16, 2006 (when electronic submission of claims via Pharmaserve commenced), and

December 31, 2007, there were **more than 7,500 prescriptions that were filled, even though the claim was not properly adjudicated by MMM.**[4]

The Hospital conducted a detailed analysis of the improperly adjudicated claims, to confirm that (a) the claim was denied; and (b) the prescription was filled.  On two separate occasions, the Hospital randomly sampled approximately 10% of the claims at issue.[5]  The process, as described in greater detail in the Schauble Cert., ¶¶ 19 - 21, was as follows:

- A subset of claims was identified;

- Each claim was reviewed to determine the reason for denial;

- Each claim was reviewed to confirm that medication was dispensed to the customer;

- The percentage of claims that were both (a) denied; and (b) dispensed, was then applied to the total value of the 8,024 open claims to determine the value of the improperly dispensed claims;

- The total value of those claims was then reduced to 35% - the average return the Hospital receives on each claim from government and third-party payors.

The two separate samples, which each included a unique set of 10% of the claims at issue, provided very similar results.  As

---

[4] The specific claim errors at issue are detailed in the Schauble Cert., ¶16.

[5] Each analysis required more than one week of dedicated time by multiple Hospital employees.  Id., ¶19.

- 24 -

set forth in detail in Ms. Schauble's Certification at ¶¶ 22 -
24, the results of the analysis provide a range among the two
samples of between $549,156 and $591,206.[6]  Even excluding the
sampling methodology, the Hospitals minimum losses as a result
of failed claims adjudication is $253,296 for 2008 and $253,102
for 2011. See Schauble Cert., at ¶19 and Exs. A and B.

     **B.**    **MMM Breached The Agreement By Failing To Enroll The
Hospital In The Government's Discount Drug Program –
340B PVP.**

At her Rule 30(b)(6) deposition, Ms. Gutfeld admitted that
MMM had a duty under the Agreement to purchase drugs for the
Pharmacy at the lowest available cost.  See Argiropoulos Cert.,
Ex. D, at 165:23 – 166:5.  MMM held itself out to the Hospital
as an expert in pharmacy management.  See Argiropoulos Cert.,
Ex. D, at 142:2-14.  Despite this expertise, MMM failed to
promptly identify a significant potential cost-savings avenue:
the federal 340B Prime Vendor Program ("340B PVP").  By failing
to enroll the Hospital in the 340B PVP, MMM breached the
Agreement.

---

[6] Such sampling is appropriate where, as here, calculating the
exact amount of damages would be burdensome.  See Kelly v.
Berlin, 300 N.J. Super. 256, 268 (App. Div. 1997) quoting Lane
v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div.
1987). See also Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88,
110 (2007)(damages need not be proved with precision where that
is impractical or impossible).  See also V.A.L. Floors,Inc. v.
Westminster Communities, Inc. 355 N.J. Super 416, 427 (App. Div.
2002) citing U.S. Naval Institute v. Charter Comm., 936 F.2d
692, 697 (2d Cir. 1991).

The 340B program is a government funded program that provides preferential pricing for hospital outpatient pharmacies with significant indigent populations.  The 340B PVP program provides pricing even lower than 340B pricing.  See Argiropoulos Cert., Ex. G, Deposition of Ray Gizienski, dated April 1, 2011, at 110:9 – 111:25.  MMM's expert admitted that is no downside to enrolling a hospital in the PVP program, and that a Hospital enrolled in 340B PVP may expect to save "between 12 and 15 percent below 340B" already discounted prices.  See Argiropoulos Cert., Ex. I, Deposition of Richard Ptachcinski, dated July 19, 2011, at 130:10–12; 132:7–13.

In private communication between MMM's COO, Bruce Scott, and its President, Eleanor Saenger, MMM admits that its failure to enroll the Hospital in the 340B PVP program during the implementation process, in May 2006, was an "oversight."  See Argiropoulos Cert., Ex. I.  Indeed, MMM was actively enrolling other clients in 340B PVP at the time.  See Argiropoulos Cert., Ex. J.

Despite MMM's overall expertise and specific knowledge of the 340B PVP program, it took the intervention of the Hospital's outside auditors, VIE Healthcare, to enroll the Hospital in the program in May 2007.  See Argiropoulos Cert., Ex. G., Gizienski Dep., at 108:23 – 112:13.  When the "oversight" was brought to MMM's attention, rather than admit its error, it planned to

cover-up its breach by contriving to claim that it had already identified the issue and was planning to enroll the Hospital. See Argiropoulos Cert., Ex. J. ("We need to reinforce that we did our due diligence on these items.")[7]  However, MMM never considered enrolling the Hospital in the PVP program before May 2007.

As a result of MMM's "oversight" in failing to enroll the Hospital in the 340B PVP program, MMM failed in its duty to purchase the cheapest available drugs for the Hospital for a period of twelve months.

There is no dispute that a hospital enrolled in the PVP program may expect to save approximately 12% on the drugs purchased through that program, instead of merely through 340B. See Argiropoulos Cert., Ex. H, Deposition of Richard Ptachcinski, dated July 19, 2011, at 130:10-12.  However, as part of its overall audit of the Hospital, VIE assessed the losses incurred by the Hospital due to MMM's failure to enroll it in 340B PVP as follows:

- $19,738.24 from an available discount in 2007 from Eli Lily for purchases of more than $200,000 of antipsychotic drugs (which the Hospital did);

---

[7] MMM's internal strategy was to "work towards verifying and reporting the weaknesses of PVP, downplay its contribution and let the burden of proving the savings be on VIE Healthcare." See Argiropoulos Cert, Ex. K.

- $1,472.09 from the failure of MMM to register the Hospital for an available 6% discount on Cymbalta purchases; and

- Based on a sampling of 40 drugs purchased after the Hospital was enrolled in 340B PVP, the Hospital saved $9,008.22 due to enrollment.  The Hospital would have enjoyed similar savings earlier, if MMM had promptly enrolled the Hospital in the Prime Vendor Program.[8]

See Argiropoulos Cert., Ex. L, VIE Report; Ex. P, Deposition of Richard Dormer of VIE, dated December 1, 2010, at 86.22-87.23.

**C.   MMM Breached The Agreement By Failing To Properly Manage The Pharmacy's Inventory.**

Section 1.5(b) of the Agreement states that "MMM shall order and maintain an inventory of Drugs on behalf of the HOSPITAL appropriate for the operation of the Pharmacy …."  See Mendelowitz Cert., Ex. C, at 3.  In its November 2005 assessment of the Pharmacy, MMM recommended that the "quality and performance measurements need to be established and used to manage purchasing and inventory efficiencies."  See Argiropoulos Cert., Ex. M; see also Ex. N.

"A proper inventory management system represents an organized approach designed to maintain the right amount of drug products in the pharmacy at all times.  There is a balance between running out of critically important drugs and having excess supply which can be costly to maintain.  Excess drugs on

---

[8] Actual data from the earlier period was not available to Mr. Dormer.  He therefore estimated the loss during the earlier period based on actual savings in the earlier period.  See, e.g., Kelly, supra, 300 N.J. Super. at 268.

the shelves is an unproductive asset of the Hospital." See
Certification of William Gouveia, dated November 8, 2011, ¶10.

The measure of appropriate inventory keeping for
pharmaceutical drugs in a hospital pharmacy is the "inventory
turn" rate.  CPS's expert Richard Ptachcinski defined "inventory
turn" as "a calculation of the number of times … a pharmacy
would turn over its inventory during a one-year period."  See
Argiropoulos Cert., Ex. H, Deposition Transcript of Richard
Ptachinski, at 72:6-16; 71:15-25; 99:1-13.  According to Mr.
Ptachcinski, 12 to 15 turns is an appropriate inventory turn
rate for a hospital pharmacy.  Id., at 106:2-17.  Kendra Grant
agreed.  She too testified that 12 to 15 inventory turns was an
appropriate standard for a hospital pharmacy.  See Argiropoulos
Cert., Ex. A, at 8.  This ratio range agrees with MMM's set rate
of 14 inventory turns for the Hospital.  MMM set this rate on
May 3, 2006, just two days after assuming the operation of the
Pharmacy.  See Argiropoulos Cert., Ex. C, at CPS 2384.

Once again MMM did not meet its goal.  Using the
inventories conducted in May 2006, when MMM took over the
Pharmacy, and December 2008, immediately after it left, the
average annual inventory turn rate while MMM ran the Pharmacy
was just 9.2.  Notably, before taking over control of the
Pharmacy, MMM calculated that the inventory turn rate at the
Hospital in 2005, while CPS operated the Pharmacy, was only

10.6.  See Mendelowitz Cert., Ex. A, at CPS 445.  Thus, a bad
situation under CPS became worse under MMM.

The inventory turns are calculated as follows:

- Total drug spending during the 31 months that MMM
  operated the Pharmacy was $18,258,043.  See
  Argiropoulos Cert., Ex. P.

- Total inventory on May 1, 2006 was $709,141.09.  See
  Argiropoulos Cert., Ex. Q at 5.

- The inventory on December 12, 2008 was $828,054.

- The average inventory over the period was **$768,598**.
  (This is an important figure to consider when
  analyzing damages caused by inefficient inventory
  keeping.)

- The average annual inventory turn rate was thus 9.2
  ($18,258,043 / $768,598 / 31 months * 12 months)[9]

Thus, a below par inventory turn rate of 10.2, when MMM took
control of the Pharmacy, **became even worse under MMM's
management**.  Further, MMM was well below its stated rate of 14
inventory turns per year for the Pharmacy.

The appropriate measurement of damages on this point is the
additional drug cost incurred by the Hospital due to MMM's
failure to meet its stated goal of 14 inventory turns.  The
additional cost to the Hospital is calculated by determining the
difference between the actual average annual inventory and the
annual average inventory if the inventory turn rate was 14:

---

[9] The formula used to calculate the turns is based on the
testimony of Plaintiff's expert, Mr. Ptachcinski.  See
Argiropoulos Cert., Ex. H, at 99:14-21.

- $18,258,043/14 turns = $1,304,146 (the average inventory for 31 months)

- $1,304,146 / 31 * 12 = $504,831 (annual average total inventory, at a rate of 14 turns)

- $768,598 – $504,831 = **$263,767 additional cost incurred due to MMM's failure to properly maintain inventory**.[10]

The evidence clearly shows that MMM did not institute a proper inventory management system that would have increased inventory turns and decreased both the Hospital's annual drug spending and the value of inventory sitting on the Pharmacy shelves.  Thus, MMM breached its obligation to "maintain an inventory of Drugs … appropriate for the operation of the Pharmacy."  See Mendelowitz Cert., Ex. C, at 3.  It was not appropriate for MMM to maintain excess inventory of drugs on the shelves at the Hospital.  As result, the Hospital was damaged in an amount no less than $263,767.

Unsatisfactory inventory turns were not the only way that MMM breached the Agreement and damaged the Hospital.  As part of its obligation to manage inventory, MMM was required to take steps to avoid the expiration of drugs.  See Argiropoulos Cert., Exs. G, Gizienski Dep. 106:14; Gutfeld Dep., 173:1-18.  See also Gouveia Cert., ¶ 15.  Rather than perform this required service itself, MMM outsourced the task to a third-party, Stericycle.

---

[10] The applied formula is derived from the expert opinion of the Hospital's pharmacy expert, William Gouveia.  See Gouveia Cert., ¶13.

However, rather than absorb the cost of using Stericycle to perform its own required task, MMM passed through Stericycle's fee to the Hospital, which was 9.1% of amount recovered.  See Argiropoulos Cert., Ex. R. at BRMC 379.  The Agreement does not authorize MMM to pass through this cost.  See Mendelowitz Cert., Ex. C at 3,5.  To the contrary, The Agreement required MMM to manage the Pharmacy's inventory.  MMM was paid a monthly fee for the service.  The only costs that MMM was permitted to pass through to the Hospital, under the terms of the Agreement, were salaries and the cost of purchasing drugs.  See Mendelowitz Cert., Ex. C at 5.

MMM employed Stericycle's services beginning in May 2006. See Argiropoulos Cert., Ex. R, at BRMC 379.  The amount of $203,145.27 in expired pharmaceuticals was inventoried by Stericycle, of which they deemed, approximately 40%, totaling $84,256.63, to be unrecoverable.  Id. at 380.  Stericycle's fee on the remaining 60% was $8,614.75.  See Argiropoulos Cert., Ex. S, Deposition of Richard Dormer at 59:1-63:1; 147:1-157:1. Thus, MMM breached the Agreement by passing through Stericycle's fees to the Hospital, and the Hospital is entitled to damages in the amount of $8,614.75.

**D.  MMM Fraudulently Induced The Hospital To Enter Into The Agreement with Promises of Savings that it Never Intended to Deliver.**

MMM promised that the Hospital would save $7 million if it agreed to retain MMM to operate the Hospital's pharmacy.  See Mendelowitz Cert., ¶ 13; Ex. A, at 10.  The Hospital relied on this promise, but the record is clear that MMM had no intention of following through on it.  MMM's promise of savings was made to fraudulently induce the Hospital to enter in the Agreement.

An action for fraudulent inducement requires proof of: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.  See Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-173 (2005) citing Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).

The majority of these elements have been established in the Hospital's analysis of its breach of contract claim in Section II, supra.[11]  However, there are two issues that have not been addressed.

-------

[11] Such as the Hospital's justified and reasonable reliance upon MMM's repeated and documented false promises of $7 million in savings, and MMM's intent that the Hospital rely upon these statements.  For example, Ms. Grant, who led the sales effort on behalf of MMM, testified at deposition that she knew the Hospital "expected that it would receive savings along the lines

First, in the context of the Hospital's fraudulent inducement claim, MMM's false promise of savings is a material misrepresentation of presently existing fact because it was made without the intent to perform." See Bell Atl. Network Serv., Inc. v. P.M. Video Corp., 322 N.J. Super. 74, 95 (App. Div. 1999)citing Dover Shopping Center, Inc. v. Cushman's Sons, Inc., 63 N.J. Super. 384, 391 (App. Div. 1960).  See also Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 380 (App. Div. 1960) (a promise to perform in the future is fraudulent if there is no present intent ever to do so); Chrisomalis v. Chrisomalis, 260 N.J. Super. 50, 56 (App. Div. 1992); Van Dam Egg Co. v. Allendale Farms, Inc., 199 N.J. Super. 452, 457 (App. Div. 1985).

Despite MMM's repeated promises of savings, there is no evidence in this case that, at the time of the proposal, MMM either believed that it could deliver $7 million in savings or that it even intended to try to do so.  The Hospital noticed a Rule 30(b)(6) deposition of a CPS witness with knowledge of the proposal and the "financial and operational assessment of [the Pharmacy]".  See Argiropoulos Cert., Ex. T, ¶¶ 1, 32-24.  In response to the notice, CPS produced Marcia Gutfeld, a Regional Vice President who was responsible for overseeing CPS's work at

that [MMM] set forth in the proposal."  See Argiropoulos Cert., Ex. B. Grant Dep., 83:3-14.

the Pharmacy from May, 2006 through December 4, 2008.  Despite

her designation under Rule 30(b)(6) by CPS, Ms. Gutfeld had no

knowledge whatsoever concerning MMM's promise to provide the

Hospital with $7 million in savings over three years,  see Ex. D

to Argiropoulos Cert., Ex. D, Gutfeld Dep., at 127: 5-16, 127:25

– 128:6, and CPS offered no other Rule 30(b)(6) witness who

could identify the basis for the proposed savings.

Ms. Grant (who was not presented pursuant to R. 30(b)(6))

testified that the source of the promised savings was a

"financial pro forma."  See Argiropoulos Cert., Ex. B, at 76:7-

13.  Ms. Grant identified Julian Mehl as the source of the

financial analysis.  Id., at 46:20- 47:1.[12]  At his deposition,

Mr. Mehl denied any involvement with the determination of the

proposed $7 million in savings.  See  Argiropoulos Cert., Ex. U,

Deposition of Julian Mehl, dated April 27, 2011, at 62:5-65:4.[13]

Furthermore, MMM undertook no action to assess whether

savings were even being delivered to the Hospital.  Ms. Gutfeld,

---

[12] Ms. Grant also identified MMM's "underwriting team" as
participating in the process, but no members of the underwriting
team were identified in CPS's Rule 26(a) disclosure or were
designated as Rule 30(b)(6) witnesses.

[13] Due to scheduling issues, Mr. Mehl's deposition was taken on
April 27, 2011, after the fact discovery cutoff of March 31,
2011.  Upon learning that Mehl was not responsible for creating
the savings proposal, as Grant testified, the Hospital requested
that CPS present a 30(b)(6) witness, consistent with its
deposition notice, on the specific issue of the $7 million
savings claim.  CPS refused.  See Ex. V to Argiropoulos Cert.

again testified in her capacity as MMM/CPS's Rule 30(b)(6) witness testified that she did not know whether the Hospital "got savings in year one of $1.5 million" or whether "Bergen Regional Medical Center received savings of $500,000 in year one." See Argiropoulos Cert., Ex. D, Gutfeld Dep. 150:11-19. Nor could Ms. Gutfeld explain "why it is that McKesson Medication Management calculated savings for Bergen Regional Medical Center in this [December 9] proposal." Id. at 127:10-16. All of this shows that fraudulent intention. See Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 396 (App. Div. 1989) citing Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J.Super. 369, 381 (App. Div. 1960)("the recklessness or implausibility of the statement in light of later events; showing that the promisor's intentions were dependent upon contingencies known only to the promisor; or simply from evidence indicating that the promisor would not or could not fulfill the promise.")

Second, and again within the context of the Hoispital's rudiment inducement claim, it is immaterial that MMM's $7 million savings promise was not explicitly listed in the Agreement.  MMM used the December 9 Proposal, which did explicitly cite the $7 million figure, to define both it's obligations and it's specific services it would provide to the Hospital.  Under New Jersey law, evidence of prior

communications between the parties is properly considered by a court on a motion for summary judgment in an action based on fraud in the inducement, even if the final agreement contains general language limiting reliance on previous oral or written representations.  Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc., 357 F. Supp. 2d 788, 795-796 (D.N.J. 2005).

This case is even more compelling that Travelodge.  In Travelodge, the plaintiff testified that defendants fraudulently induced him to enter into a franchise agreement by orally promising 15% guaranteed reservations.  Here, the Hospital can prove its reliance written promises made by MMM in the proposals, in emails, and in oral communications.  Id. at 791, 795-796.  Furthermore, MMM can offer no evidence of how it came up with $7 million in savings, how it intended to deliver, or how or whether it even bothered to make sure it deliver on this promise after the Hospital signed the Agreement – which as a matter of law was the product of MMM's fraudulent inducement.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should grant summary judgment in favor of the Hospital as to Count I (Breach of Agreement); Count III (Breach of the Implied Duty of Good Faith and Fair Dealing); and Count IV (Fraudulent Inducement).


Respectfully Submitted,


/s/  Anthony Argiropoulos

_____
Anthony Argiropoulos, Esq.
Andrew W. Schwartz, Esq.
SILLS CUMMIS & GROSS P.C.

Attorneys for Defendant
Bergen Regional Medical Center


Dated: November 10, 2011