UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CPS MED MANAGEMENT LLC f/k/a MCKESSON MEDICATION MANAGEMENT, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>BERGEN REGIONAL MEDICAL CENTER, L.P.,<br>    Defendant. | Civil Action No. 2:09-cv-4572 |
| CPS MED MANAGEMENT LLC,<br><br>Third Party Plaintiff,<br><br>    v.<br><br>McKESSON CORPORATION,<br><br>Third Party Defendant. | |

---

**DEFENDANT BERGEN REGIONAL MEDICAL CENTER'S
REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

---

Anthony Argiropoulos, Esq.
Andrew W. Schwartz, Esq.
SILLS CUMMIS & GROSS P.C.
650 College Road East
Princeton, New Jersey 08540
Tel.  (609) 227-4600
Fax  (609) 227-4646
Attorneys for Defendant
Bergen Regional Medical Center

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................... 1

LEGAL ARGUMENT .................................................. 2

    I.    THE MERGER CLAUSE IN THE AGREEMENT DOES NOT
         EXCLUDE THE SAVINGS PROMISED TO THE HOSPITAL BY
         MMM. .................................................... 2

    II.   THE HOSPITAL WAS DAMAGED BY MMM'S BREACH OF THE
         AGREEMENT ............................................... 4

         A.    The Hospital Was Damaged By MMM's Failure To
              Maintain An Appropriate Inventory In The
              Pharmacy ........................................ 5

         B.    The Hospital Was Damaged Due To MMM's
              Failure To Properly Adjudicate Claims In The
              Pharmacy. ....................................... 9

    III.  THE UNDISPUTED EVIDENCE DEMONSTRATES THAT MMM
         FRAUDULENTLY INDUCED THE HOSPITAL TO HIRE MMM TO
         MANAGE THE PHARMACY. .................................. 12

CONCLUSION ..................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Bell Atl. Network Serv., Inc. v. P.M. Video Corp.,
   322 N.J. Super. 74 (App. Div. 1999) .......................... 13

Capano v. Borough of Stone Harbor,
   530 F. Supp. 1254 (D. N.J. 1982) ............................. 14

Conway v. Corporate Center Assoc.,
   187 N.J. 259 (2006) .......................................... 2

Donovan v. Bachstadt,
   91 N.J. 434 (1982) ........................................... 5

Dover Shopping Center, Inc. v. Cushman's Sons, Inc.,
   63 N.J. Super. 384 (App. Div. 1960) .......................... 13

Iliadis v. Wal-Mart Stores, Inc.,
   191 N.J. 88 (2007) ........................................... 11

In re New Valley Corp.,
   89 F.3d 143 (3d Cir. 1996) ................................... 6

Kearny PBA Local # 21 v. Town of Kearny,
   81 N.J. 208 (1979) ........................................... 2

Ocean Cape Hotel Corp. v. Masefield Corp.,
   63 N.J. Super. 369 (App. Div. 1960) ...................... 13, 15

Pickett v. Lloyd's,
   131 N.J. 457 (1993) .......................................... 5

Prior v. Innovative Communs. Corp,
   207 Fed. Appx. 158 (3d Cir. 2006) ............................ 2

Stochastic Decisions, Inc. v. DiDomenico,
   236 N.J. Super. 388 (App. Div. 1989) ......................... 15

Totaro, Duffy, Cannova and Co., LLC, v. Lane, Middleton &
   Co., LLC, 191 N.J. 1 (2007) ............................... 4, 5

Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.,
   357 F. Supp. 2d 788 (D.N.J. 2005) ............................ 15

<u>TABLE OF AUTHORITIES</u>
(continued)

Page(s)

<u>United Pac. Ins. Co. v. Borough of Pt. Pleasant</u>,
   Civ. No. 80-446, 1986 U.S. Dist. LEXIS 17760 (D. N.J.
   Nov. 13, 1986) ............................................ 13

**OTHER AUTHORITIES**

<u>Restatement (Second) of Contracts</u>, § 214 ....................... 2

**PRELIMINARY STATEMENT**

MMM's arguments in opposition to the Hospital's motion for summary judgment exhibit a fundamental misunderstanding of contract law, in general, and this contract, in particular.

MMM erroneously claims that an integration clause in a contract is absolute and prohibits the consideration of parol evidence. This is not true. It is well-settled and undisputable that, despite the presence of an integration clause, the Court should look outside the four corners of a contract to resolve ambiguities in a contract.

As to the Agreement itself, MMM fails to recognize that many of its terms are ambiguous. Multiple terms in the Agreement, including "**for the benefit** of the Hospital" and "maintain an inventory of drugs … **appropriate** for the operation of the Pharmacy," lack sufficient definition to determine the scope of MMM's obligation. MMM argues that the absence of metrics in the Agreement precludes a finding that it breached the contract. In fact, the opposite is true. It is the absence of metrics that renders these terms ambiguous. Undisputed evidence exists, however, that reveals the parties' intended scope of each of these terms. Applying these metrics to MMM's conduct, it is clear that MMM breached the Agreement.

Accordingly, the Hospital is entitled to summary judgment.

## LEGAL ARGUMENT

### I. THE MERGER CLAUSE IN THE AGREEMENT DOES NOT EXCLUDE THE SAVINGS PROMISED TO THE HOSPITAL BY MMM.

It is settled law that this Court should consider extrinsic evidence, such as evidence of circumstances and negotiations, to aid its interpretation of an ambiguous agreement - even when the agreement has an integration clause. See Prior v. Innovative Communs. Corp, 207 Fed. Appx. 158, 162-163 (3d Cir. 2006) ("An integration clause, however, does not preclude the use of extrinsic evidence, including the course of negotiations, to interpret ambiguous terms in order to determine parties' intent"); Restatement (Second) of Contracts, § 214 ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish … the meaning of the writing, whether or not integrated").

Furthermore, Conway v. Corporate Center Assoc., 187 N.J. 259 (2006) allows for thorough examination of extrinsic evidence in the interpretation of contracts, including "consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." Id., at 269, quoting Kearny PBA Local # 21 v. Town of Kearny, 81 N.J. 208, 221 (1979).

These principles apply here, where the Agreement contains ambiguous provisions. These include provisions like "**for the benefit of** the HOSPITAL" and "maintain an inventory of Drugs on behalf of the HOSPITAL **appropriate** for the operation of the Pharmacy". See Mendelowitz Cert., Ex. C, §§ 1.1, 1.5(b) (emphasis added). The "plain" language of these phrases provides no basis to determine the reasonable expectations of the parties, the scope of MMM's duty to the Hospital, or any measure to determine MMM's compliance with the Agreement. It is thus necessary for the Court to look outside the Agreement to determine the intent of the parties.

In opposing the Hospital's motion, MMM presses the integration clause in the Agreement, but at its representatives' depositions MMM admitted that the parties' reasonable expectations of MMM's performance are set forth in the Proposal, and that the Proposal forms the contract.[1] MMM cannot distance itself from this testimony and now contest that it promised to deliver $7 million in savings. Nor can MMM contest that this promise formed the touchstone of the Hospital's decision to contract with MMM. MMM's Proposal sets forth precisely how these savings would be delivered, and the savings were

---

[1] See Argiropoulos Cert., Ex. D, Gutfeld Dep., at 54:17-55:17; 57:21-58:6; 68:12-70:12; 73:1-5; 73:23-74:3; 80:4-14; 81:11-25; 88:13-16; 88:23-89:16; 97:8-98:4; 99:14-19; 100:15-21; 101:2-10; 102:10-14; 109:1-6; 109:17-21; and 118:25-119:5.

reinforced by Ms. Grant's representations to the Hospital, upon which the Hospital justifiably relied. Id., Ex. B, Grant Dep., at 82:12-83:24. Specifically, savings would be delivered through efficiencies and cost savings measures to be implemented by MMM. Id., Ex. D, Gutfeld Dep. 139:13-19; 165:3-12.

Accordingly, the Agreement's ambiguities should be resolved by reference to the Proposal and the incorporation of MMM's promised savings into the Agreement.[2]

## II. THE HOSPITAL WAS DAMAGED BY MMM'S BREACH OF THE AGREEMENT.

Failing to deliver the promised savings is not MMM's only breach. MMM also failed to purchase an appropriate inventory of drugs for the Pharmacy and it failed to properly adjudicate insurance claims. As a result of these breaches, the Hospital is entitled to summary judgment and the award of compensatory damages. See Totaro, Duffy, Cannova and Co., LLC, v. Lane, Middleton & Co., LLC, 191 N.J. 1, 12-13 (2007). MMM is liable to the Hospital for "all of the natural and probable consequences" of the breach of the Agreement, even if the exact

---

[2]MMM's allusion to differing degrees of savings set forth in the applicable documents (see, e.g., McDonald Supp. Cert., Ex. U) is irrelevant to the issue of liability. It instead goes to damages(the measure of the amount of savings MMM failed to deliver). MMM's further suggestion that the inclusion in the Agreement of a specific target for drug savings is likewise irrelevant. This potential bonus to MMM, which was not met, also appeared in the Proposal. See Mendelowitz Cert., Ex. A, at 12. It relates to just one avenue through which MMM promised to generate cost-savings.

amount of the loss is not certain.  See Pickett v. Lloyd's, 131 N.J. 457, 474 (1993); see also Totaro, supra, 191 N.J. at 14, quoting Donovan v. Bachstadt, 91 N.J. 434, 445 (1982).

Here, it is reasonably foreseeable that the Hospital would suffer losses if MMM did not manage inventory or properly adjudicate claims as required by the Agreement.

> A. **The Hospital Was Damaged By MMM's Failure To Maintain An Appropriate Inventory In The Pharmacy.**

The Agreement expressly required MMM to "maintain an inventory of Drugs on behalf of the HOSPITAL **appropriate** for the operation of the Pharmacy." See Mendelowitz Cert., Ex. C, § 1.5(b) (emphasis added). MMM argues that, since no "metric" is expressly set forth in the Agreement, there is no applicable measure to assess its compliance with the Agreement. MMM thus argues that, despite its failure to maintain an appropriate inventory, the Hospital is not entitled to damages. Such argument is absurd; and, in effect, MMM seeks to excise this term from the Agreement.

As used in the Agreement, "appropriate" is undefined and there is nothing within the four corners of the Agreement to aid in determining the scope of this term. Is appropriate inventory measured by (a) patient need; (b) cost; (c) both; or (d) some other measure? Since the Agreement fails to reveal the measure of an appropriate inventory, the term is ambiguous and the Court

must look outside the Agreement to determine the intent of the parties. See In re New Valley Corp., 89 F.3d 143, 150 (3d Cir. 1996); see also BRMC's Br. in Opp. to CPS MSJ [Docket No. 64], at 16-18.

The undisputed evidence reveals that an "appropriate inventory" requires a balance between patient need and cost. As MMM concedes, "[t]here is a balance between running out of critically important drugs and having excess supply which can be costly to maintain. Excess drugs on the shelves is an unproductive asset of the Hospital." See Gouveia Cert., ¶ 10; see also MMM Opp. to Rule 56.1, ¶ 65. MMM further concedes that the measure of "appropriate" inventory for drugs in a hospital pharmacy is the "inventory turn" rate. See Argiropoulos Cert., Ex. H, Deposition of Richard Ptachcinski, dated July 19, 2011, at 91:14-92:11; see also MMM Opp. to Rule 56.1, ¶ 66. Thus, in determining whether or not MMM satisfied its obligation to maintain an "appropriate" inventory at the Pharmacy, it is undisputed that the Court must look at the inventory turn rate in the Pharmacy under MMM's management.

MMM admits that the appropriate inventory turn rate for a hospital pharmacy is between 12 and 15. See MMM Opp. to Rule 56.1, ¶ 67-68. MMM further concedes that its internal documents use an inventory turn rate of 14 for the Hospital. See MMM Opp.

to Rule 56.1, ¶ 69; <u>see also</u> Argiropoulos Cert., Ex. C at CPS 2384.

The Hospital has demonstrated that the inventory turn rate in the 31 months MMM operated the Pharmacy was just 9.2. <u>See</u> BRMC Moving Br., at 30. MMM concedes that this calculation was properly made. <u>See</u> MMM Opp. to Rule 56.1, ¶ 71. Its sole objection is its contention that the Hospital should not have relied on the May 2006 inventory as part of the calculation. According to MMM, it did not acquire the inventory comprising that inventory for the Hospital. This argument demonstrates a critical misunderstanding by MMM. The May 2006 inventory was only used as a baseline to show changes to the inventory that occurred between the time MMM took over the Pharmacy (May 2006) until it was terminated (December 2008). During MMM's (mis)management of the Pharmacy, the inventory turned over at an annual rate of just 9.2, well below both the industry and internal standards acknowledged by MMM.

MMM further argues that any damages to which the Hospital is entitled for its breach is just a fraction of the $263,767 demonstrated by the Hospital. MMM's position, however, is based on a misreading of Mr. Gizienski's testimony. MMM claims that he testified that the measure of damages is "the time value of money." But, Mr. Gizienski actually testified that increasing inventory turns would result in a one-time savings based on the

decrease in purchases – in this case, $263,767.  See McDonald Cert., Ex. K, 152:9-13.  MMM does not otherwise dispute the calculation of damages based on inventory turns.

In addition to ordering too much inventory, MMM also failed to purchase the least expensive drugs available.[3]  MMM admits that it did not promptly identify the 340B PVP as a significant potential cost-savings avenue and failed to timely register the Hospital for the program.  See MMM Opp. to Rule 56.1, ¶ 57.  As a result, MMM did not purchase the least expensive drugs available.  MMM also does not dispute VIE's calculation of damages resulting from MMM's failure to buy drugs from 340B PVP.  See MMM Opp. to Rule 56.1, ¶ 62.  MMM's only argument is that the sampling method employed by VIE to determine the total damage to the Hospital from the start of the contract may not be accurate.  For purposes of this motion, however, the Hospital is not seeking judgment on an extrapolated amount reflected in VIE's report, **but only on the actual losses VIE determined the Hospital incurred**.  See Argiropoulos Cert., Ex. L.  Thus, MMM's objection is irrelevant.

Finally, MMM has failed to raise a material issue of fact regarding its improper pass-through of expenses incurred from the use of an outside company to manage the expiration of drugs.

---

[3] Ms. Gutfeld conceded that MMM was responsible to purchase the least expensive drugs available.  See Argiropoulos Cert., Ex. D, at 165:23 – 166:5.

MMM claims that the Hospital agreed to the pass-through arrangement. This is not true. The email on which MMM relies states that it is a "one-time contract" "to be completed by April 20, 2006." See McDonald Cert., Ex. Z. This contract thus expired before MMM took over the Pharmacy in May 2006. MMM presents no evidence that the Hospital agreed to incur Stericycle's fee during MMM's management of the Pharmacy.

### B. The Hospital Was Damaged Due To MMM's Failure To Properly Adjudicate Claims In The Pharmacy.

The Hospital was also damaged by MMM's failure to properly adjudicate claims.[4] While managing the Pharmacy, MMM improperly dispensed prescriptions even though approval from a third-party payor had not been received. MMM claims that claims adjudication was the responsibility of the Hospital, not MMM. Overwhelming, undisputed evidence refutes MMM's claim.

As explained by Denise Schauble, Associate Vice-President of the Revenue Cycle, the claims adjudication process occurred exclusively in the Pharmacy, and was therefore exclusively in the control of MMM. See Schauble Cert., ¶ 12. Ray Gizienski, Director of the Pharmacy under MMM agreed. He explained that the claims adjudication process was set up by John Ryan (an employee of MMM) and carried out in the Pharmacy. See

---

[4] The proper adjudication of claims would result in revenue. As such, this claim is distinct from the Hospital's claims related to MMM's failure to deliver savings.

Argiropoulos Cert., Ex. G, Gizienski Dep., at 195:20 – 199:17.[5] Indeed, in May 2007, MMM reported to the Hospital the results it obtained in processing claims during October 2006 through April 2007. See, Argiropoulos Cert., Ex. N, at BRMC 3197, 3199, 3202. To the extent any doubt remains, MMM's responsibility for claims adjudication was expressly spelled out in Amendment No. 1 to the Agreement (MMM steadfastly refuses to acknowledge the import of the Amendment on these motions). See Argiropoulos Cert., Ex. F.

MMM's further contention that the Hospital bears responsibility for problems with claims adjudication because it failed to contract with third-party payors is wrong. MMM is correct that Medicare Part D will not adjudicate claims unless a contract has been signed with the particular provider. But, it was the policy of the Hospital that no prescription should be filled unless its reimbursement was approved through the adjudication process. See Schauble Cert., ¶ 12. Thus, any

---

[5] MMM cites, out of context, an excerpt of Mr. Gizienski's deposition testimony for the proposition that the Pharmacy was not responsible for claims adjudication. Curiously, MMM ignores the immediately prior testimony by Mr. Gizienski in which he testified that "I was not involved with that process so I'm not very familiar with the whole adjudication process in the outpatient pharmacy." See Argiropoulos Cert., Ex. G, at 195:20-25. Read in full, Mr. Gizienski's testimony makes clear that, while he was not involved in all aspects of it, the key elements of the adjudication process – the electronic filing of the claim and the dispensing of the prescription – occurred in the Pharmacy. Id., at 195:20 – 199:17; see also Schauble Cert., ¶ 12.

prescription that was rejected during the claims adjudication process due to the absence of a contract should <u>not</u> have been filled by the Pharmacy, <u>i.e.</u>, by MMM, to begin with. If MMM did fill rejected prescriptions – for which the Hospital would not have received reimbursement – then the fault lies with MMM which contracted to manage and operate the Pharmacy "for the benefit of the Hospital," not to its detriment. MMM cannot evade this obligation, and the Hospital is entitled to damages.

In attempting to dispute the amount of the Hospital's damages, MMM can only misconstrue the evidence – which it does. First, MMM erroneously claims that the Hospital only analyzed 829 claims. The Hospital analyzed 829 claims in 2008 *and another 824 claims in May 2011*. <u>See</u> Schauble Cert., ¶ 19. Second, MMM mischaracterizes the total number of claims at issue to be more than 100,000 annually. This amount constitutes <u>all</u> Pharmacy claims. But, the only relevant claims here are those which were not properly adjudicated, which total 8,024, of which the Hospital analyzed 21%.

Moreover, sampling of the claims, as done here, is appropriate under New Jersey law. <u>See</u>, <u>e.g.</u>, <u>Iliadis v. Wal-Mart Stores, Inc.</u>, 191 N.J. 88, 110 (2007)(damages need not be proved with precision where that is impractical or impossible).[6]

---

[6]Due to the extreme amount of time required to assess each and every one of the mis-adjudicated claims, the Hospital prepared

- 11 -

MMM's contention that sampling is not appropriate is based on its counsel's rhetoric, not on any actual evidence that it was not properly performed or appropriate under the circumstances. Thus, the undisputed facts entitling the Hospital to summary judgment are:

> (a) MMM expressly contracted to manage the claims adjudication process;
>
> (b) Under MMM's management, 8,024 claims were reported as mis-adjudicated;
>
> (c) the Hospital sampled a total of 21% of the claims;
>
> (d) Sampling was appropriate because of the sheer volume of mis-adjudicated claims and the time necessary to review each claim individually;
>
> (e) the Hospital properly assessed whether each of the 1,653 claims it sampled was properly adjudicated;
>
> (f) the Hospital incurred losses on the 21% of claims of $177,239; and
>
> (g) the Hospital incurred losses on the 100% of claims of at least $506,398.

Accordingly, the Hospital is entitled to summary judgment for MMM's failure to properly adjudicate claims and an award of damages of $506,398.

### III. THE UNDISPUTED EVIDENCE DEMONSTRATES THAT MMM FRAUDULENTLY INDUCED THE HOSPITAL TO HIRE MMM TO MANAGE THE PHARMACY.

In order to induce the Hospital to hire MMM to manage the Pharmacy, MMM repeatedly promised that the Hospital would save more than $7 million dollars over three years. This was not

---

two separate analyses, each of which included approximately 10% of the total claims. Id.

mere "bluster" or "puffery," but was a deliberate statement by MMM made with the expectation (and desire) that the Hospital would act in reliance on the promise. See Argiropoulos Cert., Ex. B, Grant Dep. 82:12-83:24. The evidence amply demonstrates that MMM never intended to deliver any savings close to the promised $7 million, and that MMM merely made the promise to induce the Hospital to hire MMM to operate the Pharmacy.

This is important because in the context of the Hospital's fraudulent inducement claim, MMM's false promise of savings is a material misrepresentation of presently existing fact if it was made without the intent to perform. See, e.g, Bell Atl. Network Serv., Inc. v. P.M. Video Corp., 322 N.J. Super. 74, 95 (App. Div. 1999) citing Dover Shopping Center, Inc. v. Cushman's Sons, Inc., 63 N.J. Super. 384, 391 (App. Div. 1960); see also Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 380 (App. Div. 1960). Further, "New Jersey case law recognizes a cause of action for misrepresentations of a present state of mind, with respect to a future matter." See United Pac. Ins. Co. v. Borough of Pt. Pleasant, Civ. No. 80-446, 1986 U.S. Dist. LEXIS 17760 (D. N.J. Nov. 13, 1986), citing Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 380 (App. Div. 1960). Specifically,

> A false representation of an existing
> intention, i.e., a "false state of mind,"
> with respect to a future event has been held

> to constitute actionable misrepresentation
> …. In other words, the defendant must have
> no intention at the time he makes the
> statement of fulfilling the promise.
> Defendant's lack of intention may be shown
> circumstantially by his subsequent acts and
> by subsequent events or by evidence that the
> statement was impossible to fulfill based
> upon contingencies or circumstances known to
> the promisor at the time of the statement
> but unknown to the promisee.

See Capano v. Borough of Stone Harbor, 530 F. Supp. 1254, 1264 (D. N.J. 1982).

And here, the facts demonstrate the absence of such intent. For example, MMM failed to take the most rudimentary steps to control costs – all of which were well within its expertise – including conducting regular inventories of the Pharmacy and registering the Hospital for 340B PVP.  Another example concerns Ms. Gutfeld, who was in charge of MMM's compliance with the Agreement.  Certainly, if MMM intended to deliver the promised $7 million in savings laid out in the Proposal, then Ms. Gutfeld would at least have some inkling about it.  However, she professed that she did not.  See Argiropoulos Cert., Ex. D, Gutfeld Dep., at 127: 5-16, 127:25 – 128:6.  MMM's fraudulent intent is evident by MMM's post-Agreement failure to (a) attempt to deliver savings; (b) failure to track inventory; (c) failure to obtain the best prices for drugs; (d) failure to even check the prices of drugs; and/or (e) failure to enact any internal procedures regarding any of this.  See Argiropoulos Cert., Ex.

D, at 90:21 – 91:9; 95:3-7; 148:19 – 149:2. This is ample evidence of MMM's fraudulent intent, and the absence of the $7 million promise from the Agreement that it framed from the outset simply does not hold water.  See Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 396 (App. Div. 1989) citing Ocean Cape Hotel Corp., supra 63 N.J.Super., at 381 (App. Div. 1960); see also Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc., 357 F. Supp. 2d 788, 795-796 (D.N.J. 2005).

Accordingly, MMM is entitled to summary judgment on its fraudulent inducement claim.

## CONCLUSION

For all of the foregoing reasons, and the reasons set forth in the Hospital's moving papers, the Court should grant summary judgment to the Hospital on its Counterclaims.

Respectfully Submitted,

_____
Anthony Argiropoulos, Esq.
Andrew W. Schwartz, Esq.
SILLS CUMMIS & GROSS P.C.

Attorneys for Defendant
Bergen Regional Medical Center

Dated: December 23, 2011