## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **CPS MEDMANAGEMENT LLC f/k/a McKesson Medication Management, LLC** | : : : | Civ. No. 2:09-4572 (KM) |
| **Plaintiff,** | : : | **OPINION** |
| **v.** | : : : | |
| **BERGEN REGIONAL MEDICAL CENTER, L.P.,** | : : : | |
| **Defendant.** | : | |
| **CPS MEDMANAGEMENT LLC** | : : | |
| **Third Party Plaintiff,** | : : | |
| **v.** | : : : | |
| **MCKESSON CORPORATION,** | : : | |
| **Third Party Defendant.** | : : | |

**KEVIN MCNULTY, U.S.D.J.:**

   This action arises from an Agreement in which Defendant Bergen Regional Medical Center, L.P. (the "Hospital") engaged McKesson Medication Management, LLC ("MMM") to manage its hospital pharmacy.[1] Each party alleges that the other has failed to perform its obligations under the Agreement. Pending before the Court are dueling motions for summary judgment pursuant

---

[1]   Until 2006, the manager of the Hospital's pharmacy was Comprehensive Pharmaceutical Services, Inc. ("CPS"). CPS was succeeded by MMM, the entity that entered into the 2006 Agreement that is the subject of this action. Through a corporate recombination, however, CPS reentered the picture. In early 2008 (two years into the three-year term of the Agreement at issue here), MMM was sold to PPS Holdings, Inc., the parent company of CPS. PPS Holdings then combined CPS and MMM into one entity called CPS MedManagement LLC ("CPSMM"). CPSMM, the current entity, is the Plaintiff here. In the statement of facts, I will distinguish CPS, MMM, and CPSMM as necessary to make the historical sequence clear. For simplicity, however, the discussion of issues will generally ignore those distinctions and treat this as a dispute between the contracting parties, *i.e.*, "the Hospital" and "MMM."

to Federal Rule of Civil Procedure 56. First, MMM has moved for summary judgment on the claims in its complaint. Second, both the Hospital and MMM have moved for summary judgment on the Hospital's counterclaims. The Court heard oral argument on March 19, 2013.

MMM's complaint alleges that the Hospital is liable on five unpaid invoices for services and inventory. [2] As to these claims, I find the evidence to be essentially uncontroverted. The Hospital neither paid the outstanding invoices nor disputed them as required by the parties' Agreement. I therefore grant MMM's motion for summary judgment on its breach of contract and book account claims. I will stay entry and execution of that partial judgment, however, because the Hospital has an unresolved, offsetting counterclaim. I also put off until later any application for late fees, interest, or attorney's fees.

The Hospital asserts a counterclaim for breach of contract, misrepresentation, breach of the implied duty of good faith and fair dealing, and fraudulent inducement.[3] The counterclaim has two components.

The first component is a claim that MMM fell short on what the Hospital says was a contractual promise to realize $7 million in cost savings over the three-year term of the Agreement. Those cost savings were projected in the course of negotiations, but were never made a part of the written Agreement, which is a fully negotiated, integrated document. Primarily for that reason, I grant MMM's motion for summary judgment, and deny the Hospital's motion for summary judgment, on this cost-savings component of the Hospital's counterclaim.

The second component of the Hospital's counterclaim is a claim that MMM breached the parties' Agreement by rendering deficient performance in several respects. In broad strokes, the Hospital alleges that MMM did not properly manage the Pharmacy's inventory and did not adjudicate claims appropriately. As to this deficient performance component of the counterclaim,

---

[2]   As third party plaintiff, CPSMM brings a claim against McKesson Corporation based on a contractual indemnity provision entered into in connection with CPS's purchase of MMM. *See* n.1, *supra*. The summary judgment motions do not involve that third party complaint.

[3]   The counterclaim contains a fifth cause of action for negligence, but the Hospital now states that it "is willing to withdraw its negligence claim, without prejudice." (Def. Opp. at 40 [ECF No. 64]). Accordingly, the negligence claim will be dismissed.

I find genuine issues of material fact, and deny both sides' motions for summary judgment.

## FACTS & PROCEDURAL HISTORY[4]

### A. The Hospital Seeks A New Operator For Its Pharmacy

The Hospital is a behavioral health, long term care, and acute general care hospital in Paramus, New Jersey. (Def. Facts ¶ 1 [ECF No. 61-1]). Its Department of Pharmaceutical Services (the "Pharmacy") has both inpatient and outpatient components. (*Id.* ¶ 3). The inpatient pharmacy dispenses medications to patients who are admitted to the hospital; the outpatient pharmacy fills prescriptions for customers, like any retail drugstore. (*Id.* ¶ 4).

From approximately 2002 until May 2006, the Hospital contracted with CPS to operate the Pharmacy. (Pl. Facts ¶¶ 2, 9 [ECF No. 60-6]; Def. Facts ¶ 6). The Hospital was not satisfied with CPS's performance, however, and in 2005 began looking for a replacement. (Pl. Facts ¶ 4; Def. Facts ¶ 7). The Hospital invited MMM to submit a proposal. (Pl. Facts ¶ 5; Def. Facts ¶¶ 8, 12).

MMM submitted its initial proposal on December 7, 2005 (the "December 7 Proposal"), and submitted an updated proposal on December 9, 2005 (the "December 9 Proposal"). (Def. Facts ¶¶ 12, 16). Each stated that "[p]ricing and terms in this proposal are effective through December 31, 2005." (Dec. 7, 2005 Proposal at 12, Ex. A to Mendelowitz Cert. [ECF No. 61-4]; Dec. 9, 2005 Proposal at 12, Ex. A to Argiropoulos Cert. [ECF No. 61-8]). The proposals were based upon "an open book management fee business model." Each proposed a set monthly fee, as opposed to one that varied based on performance. (Dec. 7 Proposal at 10; Dec. 9 Proposal at 10).

The December 9 Proposal stated that MMM would "significantly reduce pharmacy expense over the next three years," "optimize inventory and manage the purchasing and inventory system on an ongoing basis," and "support and enhance the Hospital's current clinical and formulary management programs and introduce additional programs that will be a building block for clinical safety and cost reduction for many years to come." (Dec. 9 Proposal at 3). MMM projected that its management of the Pharmacy would "allow the Hospital to

---

[4]      Pursuant to L. Civ. R. 56.1, each party has submitted (1) a statement of material facts believed to be undisputed and (2) a corresponding response to the other party's statement of undisputed material facts. The Hospital also submitted a reply to MMM's responsive statement of material facts. The facts discussed here are taken from those submissions and supporting affidavits.

realize $7 million in savings over the next three (3) years." (*Id.* at 10). That $7 million projection was broken down by year: savings in "year one of $1,526,140," savings in "year two of $2,324,983," and savings in "year three of $3,094,945," (*id.*), for a total of nearly $7 million (actually $6,946,068).[5] In addition, MMM touted its Purchasing Alliance for Clinical Therapeutics ("PACT") as a means of minimizing medication costs "in selected therapeutic categories," thereby "achiev[ing] savings unrivaled by other entities." (Dec. 7 Proposal at 28).

On December 14, 2005, the Hospital inquired whether MMM planned to upgrade the IV mixing room to ensure regulatory compliance. Pointedly, the Hospital noted that the current operator, CPS, had offered to partially fund such an upgrade if its contract were renewed. (Ex. B to Mendelowitz Cert. [ECF No. 61-4]). MMM responded that it would allocate money for renovations from the $1.5 million in savings it anticipated during the first year. (*Id.*).

B. The Pharmaceutical Services Agreement

The Hospital ultimately selected MMM to operate the Pharmacy, and the parties entered into a Pharmaceutical Services Agreement (the "Agreement"), dated March 23, 2006. (Ex. C to Mendelowitz Cert. [ECF No. 61-4]). The three-year term of the Agreement ran from May 1, 2006, through April 30, 2009. (*Id.* § 4.1).

The Agreement contained a merger clause, which stated:

> This Agreement, any Amendments or Addenda hereto, and any Schedules or Exhibits specifically mentioned herein constitute the entire Agreement between the parties regarding the subject matter hereof and supersede all prior or contemporaneous discussions, representations, correspondence and agreements, whether oral or written, pertaining thereto. . . . This Agreement may be amended or modified only by a writing duly executed by both parties expressly indicating intent by the parties to amend this Agreement.

(*Id.* § 5.16).

---

5    The December 7 Proposal contained similar figures. (Dec. 7 Proposal at 12). MMM internal documents confirm that it anticipated approximately $1.5 million in savings in the first year of the contract. (Ex. C to Argiropoulos Cert. at CPS 2389 [ECF No. 61-8]).

Pursuant to the Agreement, MMM was to perform certain services "[f]or the benefit of [the Hospital]," namely, to:

(a.)   Maintain a Unit Dose System of medication distribution;

(b.)   Maintain an I.V. admixture program;

(c.)   Maintain pharmacy patient profiles;

(d.)   Develop and update from time to time, with [the Hospital]'s cooperation and approval, Pharmacy policies, procedures and operations manuals;

(e.)   Conduct inservice educational programs for appropriate committees and staff of [the Hospital] pertaining to pharmaceutical services as appropriate or on an as requested basis;

(f.)   Participate in [the Hospital]'s Pharmacy and Therapeutics Committee or equivalent;

(g.)   Establish and maintain with [the Hospital] a drug surveillance and drug utilization review program;

(h.)   Comply, with [the Hospital]'s cooperation, with all applicable Federal and state laws, rules and regulations . . . ;

(i.)   Implement MMM's Quality Assessment Process and Performance Improvement Program;

(j.)   Provide [the Hospital] with specific drug utilization data in order to allow for patient billing;

(k.)   Monitor patient medication profiles at the time of dispensing for medication allergies, drug interactions, duplication of therapy and contraindications, with notification provided by the pharmacist to the prescriber of any serious or significant issues; and

(l.)   Ensure that (i) full and complete pharmacy records and charts are prepared and maintained by the Pharmacy in compliance with all Federal and state laws, rules and regulations and applicable standards of accrediting agencies of [the Hospital]; (ii) all pharmacy patient records and charts conform to good pharmacy practice so as to permit patient care and quality review; and (iii) there are accurate, daily records of all services and items provided by the Pharmacy to [the Hospital] patients.

(*Id.* § 1.1).

The Agreement also placed on MMM certain specific responsibilities with respect to the Pharmacy inventory. First, MMM had to purchase the inventory left over from CPS. (*Id.* § 1.5(a)). Second, MMM had to "order and maintain an inventory of Drugs on behalf of [the Hospital] appropriate for the operation of the Pharmacy and to meet the requirements of [the Hospital]'s Medical Staff, including all Drugs as specified by [the Hospital]'s Pharmacy and Therapeutics Committee and Medical Staff." (*Id.* § 1.5(b)). Third, MMM was required to "order the above referenced inventory of Drugs using the Purchasing Alliance for Clinical Therapeutics (PACT) purchasing portfolio and [the Hospital] shall retain any rebates received in relation to Drugs purchased by MMM on behalf of [the Hospital]." (*Id.* § 1.5(c)).

In exchange for MMM's services, the Hospital agreed to pay MMM a monthly fee and to cover the salary and benefits MMM paid to its employees. (*Id.* § 2.2(a)-(b)). In addition, MMM was eligible for a one-time performance bonus if, in calendar year 2006,[6] it realized $500,000 in total drug cost savings in comparison with 2005. (*Id.* § 2.2(c)).

The Agreement stated that MMM would invoice the Hospital monthly. (*Id.* § 3.1). The Hospital was required to pay each invoice within 30 days of the invoice date unless it disputed the charges. (*Id.* § 3.2). To dispute an invoice, the Hospital was required to follow a certain procedure:

> If [the Hospital] disputes any amount on MMM's invoice, it shall notify MMM by the date on which the invoice is due indicating any amounts in dispute. If [the Hospital] does not notify MMM in writing of any dispute within said period, MMM's invoice shall be deemed approved. A resolution to any disputed amounts shall be reached within thirty (30) days of notice of dispute. Payment of the resolved amount shall be due immediately upon resolution. If payment is not received within five (5) days of the date of resolution, late charges and interests (pursuant to Section 5.7) shall be applied retroactively to the date on which the invoice was due.

---

[6]   The reference is to calendar year 2006 as a whole, although the Agreement was not signed until March, and actually took effect as of May 1, 2006. The December Proposals appear to contemplate that the Agreement would be entered into on or about December 31, 2005; this may be the explanation. At any rate, it is not material for present purposes.

(*Id.* § 3.3).

Any invoice not disputed by that procedure was deemed to be approved by the Hospital. (*Id.* § 3.2) Invoices not timely paid would carry a late charge of five percent of the invoiced amount plus interest of 1.5% per month. (*Id.* § 5.7).

Either party could terminate the Agreement early if the other party defaulted, or could terminate without cause, subject to certain conditions.[7]

The provision authorizing early termination for default states:

> If either party defaults in the performance of its obligations under this Agreement the other party must notify the defaulting party in writing of the default. Such notice must describe the areas of unsatisfactory performance with sufficient particularity to enable the other party to take appropriate corrective measures. If such default is not cured within thirty (30) days of the receipt of written notice thereof (or ten [10] days in the case of an obligation to pay money), then the nondefaulting party shall have the right, in addition to any other rights it may have, by further written notice to terminate this Agreement on any future date not less than thirty (30) days (or ten [10] days in the case of an obligation to pay money) from the date of such further notice. However, if the nature of the default (except in the case of an obligation to pay money) is such that more than thirty (30) days are reasonably required for its cure, then the defaulting party shall not be deemed to be in default if it commences such cure within said thirty (30) day period and thereafter pursues such cure to completion.

(*Id.* § 4.2(b)).

The provision authorizing early termination without cause requires 90 days' written notice. (*Id.* § 4.2(f)). Although either party could terminate without cause, the Hospital could do so only if it were current on all undisputed invoice payments to MMM. (*Id.*).

Upon termination of the Agreement (whether for default or without cause), the Hospital would incur certain obligations: (1) to pay all amounts due

---

[7]   The Agreement provides other grounds for early termination that are not relevant here.

within ten days; (2) to purchase the inventory of the Pharmacy in an amount equal to what MMM paid for the initial inventory, regardless of the value of the inventory at the time of termination; (3) to reimburse MMM for customary relocation and recruiting costs for any employee MMM had hired in the preceding 12 months; and (4) to pay the costs MMM incurred in vacating the Hospital. (*Id.* § 4.3).

"If either party [brought] an action against the other to enforce any condition or covenant of [the] Agreement, the substantially prevailing party [would] be entitled to recover its court costs and reasonable attorneys' fees incurred in such action." (*Id.* § 5.17).

About six months into the Agreement term, on October 27, 2006, the parties entered into Amendment No. 1. (Ex. F to Argiropoulous Cert. [ECF No. 61-9). Amendment No. 1 imposed two new responsibilities: MMM would (1) "[o]versee the billing function, on behalf of the hospital, for third party insurance carriers (including Medicaid) for services provided to patients in conformity with the usual and proper method required or accepted under the respective reimbursement or payment plans" and (2) MMM would "[c]omply with U.S. Public Health Service 340B/FQHC discounted drug program rules and regulations." (*Id.* § 2).

## C. The Hospital's External Auditor Issues A Report

The Hospital acknowledges that MMM performed the basic services required under the Agreement. (Def. Facts ¶ 30). In mid-2007, however, Vie Healthcare conducted an audit of all of the Hospital's departments, including the Pharmacy. (Def. Facts ¶ 32). That audit found, among other things, that MMM had failed to enroll the Hospital in the 340B Prime Vendor Program ("340B PVP"); that MMM improperly managed inventory, especially with respect to expired drugs; and that MMM had not always ordered the least expensive available pharmaceuticals. (*Id.* ¶ 33). The Hospital also believed, independent of the audit findings, that MMM was overcharging for travel expenses and was not properly adjudicating claims. (*Id.* ¶ 34).

In a letter dated April 11, 2008, the Hospital sent MMM a notice of default and opportunity to cure under the Agreement. (Ex. D to Mendelowitz Cert. [ECF No. 61-4]). The letter claimed that these alleged contractual breaches caused the Hospital to lose revenues of over $1 million. (*Id.*). The letter itself served "as a ***formal notice of default,*** pursuant to § 4.2(b) of the Agreement, that [MMM] is in default of said Agreement and its responsibilities thereunder to effectively and efficiently manage the Hospital's pharmacy

services, and that the Hospital demands cure of all the issues listed above within thirty (30) days." (*Id.*) (emphasis in original).

The Hospital and MMM exchanged emails and letters, but MMM did not agree to compensate the Hospital for the allegedly lost revenue. (Def. Facts ¶ 37; Exs. E, F to Mendelowitz Cert. [ECF No. 61-4]).

### D. The Hospital Terminates the Agreement

On August 22, 2008, the Hospital sent a letter to MMM giving 90 days' notice of termination without cause, which was to be "**effective November 16, 2008.**" (Ex. G to Mendelowitz Cert. [ECF No. 61-4]) (emphasis in original); *see* Agreement § 4.2(f)).

On November 4, 2008, the Hospital sent another letter to MMM, invoking the termination-for-default provision (Agreement § 4.2(b)). The letter stated that the defaults noted in the April 11, 2008, letter had not been cured within 30 days as required. (Ex. H to Mendelowitz Cert. [ECF No. 61-4]).

The termination for cause and termination for default were independent: the November 4, 2008 letter served "as written notice of ***termination for default*** of said agreement, **effective December 4, 2008.** Said notice ***does not*** waive the Hospital's September 3, 2008 formal notice of termination without cause, effective December 4, 2008." (*Id.*) (emphasis in original).

On December 4, 2008, the termination took effect and MMM stopped operating the Pharmacy. The Hospital had already stopped paying MMM's invoices, and five of MMM's invoices to the Hospital are now outstanding. (Pl. Facts ¶ 26; Def. Facts ¶ 41). Four of these are invoices in the ordinary course for MMM's services in November and December 2008; these totaled $395,662.79. (*Id.* ¶¶ 26, 28). The fifth was an invoice for the repurchase of pharmaceutical inventory, totaling $709,141.09.[8] (Pl. Facts ¶ 26).

The Hospital concedes that, over the course of the contract, MMM delivered savings of $4,660,574. (Hospital's Analysis of Proposed Savings versus Actual Savings, Ex. E to Argiropoulos Aff. [ECF No. 61-7]). It alleges, however, that this fell short of the promised $6.2 million in savings (prorated to account for early termination).

---

[8]    As provided in § 4.3 of the Agreement, this figure was based on the price at which MMM had purchased the then-current inventory when it took over the Pharmacy in 2006.

E. <u>This Action</u>

This state-law action was brought under the court's diversity jurisdiction. MMM is a Delaware limited liability company with its principal place of business in Tennessee. Its sole member, PPS Holdings, Inc., is a citizen of Tennessee. The Hospital is a New Jersey limited partnership. Its general and limited partners are citizens of either Colorado or New York. McKesson Corporation is a Delaware corporation with its principal place of business in California. Because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue in this District is proper under 28 U.S.C. § 1391(a) because the Hospital is a resident of New Jersey and a substantial part of the events and omissions underlying MMM's claims occurred in New Jersey.

On September 4, 2009, MMM filed the present suit. The complaint alleges five causes of action: breach of contract for failing to pay the last five invoices; breach of contract for improperly terminating the contract for cause where no cause existed; book account for goods and services MMM provided; unjust enrichment; attorneys' fees and costs.

On October 9, 2009, the Hospital answered and filed a counterclaim against MMM. The counterclaim alleges breach of contract for failure to perform the express and implied terms of the Agreement; fraud with respect to the services MMM could offer the Hospital; breach of the implied duty of good faith and fair dealing; fraudulent inducement; and negligence.

On November 10, 2011, these Motions for Summary Judgment were filed. The judge then assigned to the case sent it out for mediation, which failed, and the motions were restored to the calendar in September 2012.

## II.  LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate where "there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law."); *Alcoa, Inc. v. U.S.*, 509 F.3d 173, 175 (3d Cir. 2007). Summary judgment is desirable because it eliminates unfounded claims without resort to a costly and lengthy trial, *Celotex*, 477 U.S. at 327, but a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see *Anderson*, 477 U.S. at 247-48. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468-69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp. 2d 254 (D.N.J.1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 168, 184 (2009); *Williams v. Philadelphia Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir.1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

## III.   ANALYSIS

The claims as to which summary judgment is sought break down into three major categories:

    a) MMM's claims that the Hospital failed to pay or dispute five invoices.

b) The Hospital's counterclaim that MMM failed to deliver $7 million ($6.2 million prorated) in promised cost savings.

c) The Hospital's counterclaim that MMM deficiently performed its obligations under the Agreement by mismanaging the inventory and failing to properly adjudicate claims.

The following discussion is organized accordingly.

A.   <u>MMM's Motion For Summary Judgment On Its Invoices</u>

MMM argues that summary judgment is appropriate on its five outstanding invoices because the Hospital neither paid the invoices nor disputed them in the manner prescribed by the Agreement. Therefore, says MMM, the Hospital owes it this amount as a matter of law. The Hospital replies that it did impliedly dispute these amounts when it wrote letters notifying MMM of MMM's allegedly deficient performance of the contract. I agree with MMM that the evidence is not significantly in conflict. The Hospital did not pay for these invoices or dispute them via the procedure required by the Agreement.

MMM argues that by failing to pay or dispute its last four monthly service invoices and its inventory invoice, the Hospital breached the Agreement.[9] The Hospital acknowledges it did not pay the invoices. The Hospital asserts one potential disputed issue of fact – whether it properly disputed the invoices – which I do not find to be substantial. The Hospital makes an argument of law – recoupment, based on its counterclaims – which does not detract from the validity of MMM's claims on its invoices, but does

---

[9]   This claim implicates four of the five causes of action pleaded by MMM: breach of contract, unjust enrichment, book account, and attorneys' fees and costs. Because I find for MMM on the breach of contract and book account claims, it is unnecessary to consider unjust enrichment, and I will deny that part of MMM's summary judgment motion as moot. *See Van Orman v. American Ins. Co.,* 680 F.2d 301, 311 (3rd Cir. 1982) (New Jersey law)*; Moser v. Milner Hotels,* 6 N.J. 278, 280-81, 78 A.2d 393, 394 (1951); *Caputo v. Nice-Pak Products, Inc.,* 300 N.J. Super. 498, 507, 693 A.2d 494, 498 (App. Div. 1997) (plaintiff may recover on contract or unjust enrichment theory, but not both).

As stated below, I find that an application for attorney's fees is premature, so I will deny that portion of MMM's summary judgment motion without prejudice to a later application. MMM does not move for summary judgment on its fifth cause of action, breach of contract based on early termination of the Agreement.

incline me to stay entry and execution of judgment on MMM's claims. (Def. Opp. at 12-15 [ECF No. 64]).

"To establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265, 920 A.2d 678, 689 (App. Div. 2007). Failure to make contractually required payments constitutes a material breach. *Magnet Resources, Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 287, 723 A.2d 976, 982 (App. Div. 1998).

A book account claim is "one of the recognized remedies in New Jersey to recover the moneys due for goods sold and delivered," *In re Gottlieb & Co.*, 245 F. 139, 146 (D.N.J. 1917), *aff'd sub nom. Rosenberg v. Semple*, 257 F. 72 (3d Cir. 1919). It "is similar in nature to a breach of contract, except that 'the amount owed for services rendered can be proved by a statement of account.'" *Manley Toys, Ltd. v. Toys R Us, Inc.*, Civ. No. 12-3072, 2013 WL 244737 (D.N.J. Jan. 22, 2013) (unpublished) (quoting *Transmodal Corp. v. EMH Associates, Inc.*, Civ. No. 09–3057, 2011 WL 124641, at *7 (D.N.J. Jan. 14, 2011) (unpublished)). "However, when the reasonable value of those services is placed in issue . . . the books of account alone usually cannot supply that proof." *Hackensack Hosp. v. Tiajoloff*, 85 N.J. Super. 417, 419–20, 204 A.2d 902 (App. Div. 1964). Because the book account claim is similar to breach of contract, I will analyze them together. And, as noted below, the Hospital does not challenge the specific amounts on the invoices at issue.

MMM and the Hospital entered into a valid Agreement. Pursuant to that Agreement, approximately monthly, MMM sent the Hospital invoices, the last four of which the Hospital admittedly did not pay. (Pl. Facts ¶ 26; Def. Response to Pl. Facts ¶ 26 [ECF No. 64-1]). Those four unpaid invoices are:

| | | |
|---|---|---|
| (1) November 30, 2008, in the amount of: | $300,720.78 | |
| (2) December 5, 2008, in the amount of: | $ 92,001.29 | |
| (3) December 31, 2008, in the amount of: | $      335.53 | |
| (4) January 31, 2009, in the amount of: | $    2,605.19 | |
| TOTAL: | $395,662.79 | |

(Ex. A to Gutfield Cert.).

MMM also claims that the Hospital withheld payment of a fifth invoice for the value of the inventory MMM initially purchased from the Hospital. (Pl. Facts ¶ 26; Def. Response to Pl. Facts ¶ 26 [ECF No. 64-1]). That invoice, in the

amount of $709,141.09, is dated November 28, 2008. (Ex. A to Gutfield Cert.). The invoice is based on the Agreement's requirement that the Hospital "purchase the inventory in the Pharmacy from MMM for the amount paid by MMM for the Initial Inventory as set forth in Section 1.5 above within thirty (30) days . . . ." (Agreement § 4.3).

The Hospital admits that it did not pay these five invoices, which total **$1,104,803.88**.

The question remains whether the Hospital's duty to pay was suspended by a legitimate dispute. Pursuant to § 3.3 of the Agreement, the Hospital was required to either pay MMM or notify it in writing of any dispute within 30 days of the invoice date. The Hospital contends that it furnished such written notice in the April 11, 2008 default letter and subsequent letters in which it enumerated MMM's alleged breaches of the Agreement.

I reject the Hospital's argument for three reasons:

First, the Agreement required the Hospital to notify MMM that it disagreed with any invoice in writing within 30 days after the invoice date. The last letter that the Hospital sent was dated November 4, 2008 – 26 days *before* the date of the earliest unpaid invoice. The Hospital had not yet even seen the invoices it "disputed" when it wrote those letters. This did not comply with the procedure to dispute invoices as provided in the Agreement.

Second, the Agreement did not authorize the Hospital to suspend payment if it intended to terminate. On the contrary, the Hospital was contractually obligated to pay all amounts due within ten days of termination. The Hospital did not do so.

Third, the Hospital sent the default letter in April 2008, but did not stop paying invoices until many months later; the unpaid invoices cover November and December 2008. In other words, the Hospital paid invoices covering April May, June, July, August, September and October 2008, even though – according to their argument – the April 2008 letter constituted notice that such subsequent invoices were "disputed." The Hospital's theory seems to be that, having sent the April 2008 letter, the Hospital could later deem it to have been a notice of dispute as to a particular invoice, or not, *nunc pro tunc*. That is not a sustainable interpretation of the Agreement.

In short, the Hospital did not dispute the November and December invoices in the manner prescribed by the Agreement. Because it neither disputed nor paid those invoices, the Hospital breached the Agreement. I will therefore grant partial summary judgment as to MMM's causes of action for breach of contract and book account, insofar as they are based on the five unpaid invoices.

I will stay entry and execution of that partial judgment, however, for the following reason. The Hospital argues that it properly withheld payment pursuant to the doctrine of recoupment.[10] While I am reluctant to condone such self-help, the fact remains that the Hospital's counterclaims present triable issues of fact. *See* Section III.C, *infra*. If the fact finder were to determine that MMM breached the Agreement, the Hospital's liability for the five invoices might be offset or eliminated.[11]

The five invoices, as stated, total $1,104,803.88. The final amount of this partial judgment may also eventually reflect interest, late charges and fees. Section 5.7 of the Agreement imposes a late charge of 5% of the invoiced amount and monthly interest of 1.5%, which "shall accrue from the date on which MMM's invoice was due and continue to accrue until receipt of

---

[10]    Recoupment and setoff are similar, though analytically distinct. "Setoff is a counterclaim arising from an independent claim that a party has against its adversary. Recoupment is the right of a party to have the adversary's monetary claim reduced due to a claim the party has against the adversary that arises out of the very contract underlying the party's claim." *Goldwell of N.J. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 196 (D.N.J. 2009). *Goldwell* cited *FDIC v. Marine Midland Realty Credit Corp.*, 17 F.3d 715, 722 (4th Cir. 1994), which suggests that "[w]hen the amounts owing by each party are determined at trial, the doctrine of recoupment should be permitted to balance the amounts before payment is required.". In suspending entry and execution of judgment, I have here extended the practical principle of *Marine Midland* to a situation where one party's liability has been determined, not at trial, but in advance of trial, on partial summary judgment.

[11]    Indeed, the Hospital's recoupment argument is the true basis for its claim that the invoices were "disputed." My stay of judgment thus essentially moots the issue of whether the Hospital properly disputed the invoices. The court may simply "net out" the claims and counterclaims at the close of the case.

At oral argument, MMM's counsel suggested that recoupment would apply only to MMM's management fee from the unpaid invoices (about $20,000) because the rest of the invoice consists of payments that are passed through to the pharmacies, and not retained by MMM. I note, however, that some of the Hospital's claims relate to overcharges on the drugs and to other matters that do not directly correspond to the size of MMM's management fee.

payment."[12] In addition, MMM moves for summary judgment as to its fifth claim, which seeks attorneys' fees and costs. That Section authorizes the "substantially prevailing party" to recover its costs and attorneys' fees. (Agreement § 5.17). Because, for example, certain counterclaims have not yet been adjudicated, it would not be prudent or appropriate to identify the "substantially prevailing party" or to assess the reasonableness of fees at this stage. Summary judgment is thus denied without prejudice to an application for attorney's fees at the proper time. In short, the calculation of interest, late charges and fees may be put off until around the time of final judgment.

B.  Motions for Summary Judgment on the Hospital's Cost Savings Counterclaim

The parties have filed mirror-image summary judgment motions on the Hospital's counterclaim. In this Section, I focus on the Hospital's claim that MMM breached the Agreement by failing to achieve promised cost savings of $7 million over the three-year term of the Agreement. (As noted, the Hospital has prorated that total to $6.2 million, to account for its early termination of the Agreement.) As to these cost savings, the Hospital asserts two primary theories: breach of contract and fraudulent inducement to enter into the contract.

1.  Breach of Contract

The Hospital asserts that MMM breached the Agreement because its operation of the Pharmacy produced only $4.6 million in cost savings, not the $6.2 million (prorated) that MMM projected in the December 7 and December 9 Proposals.[13] The Hospital does not identify any explicit undertaking in the

---

[12]  At oral argument, the Hospital attempted to distinguish the four monthly invoices (to which late fees and interest apply) from the fifth, inventory invoice (to which, it argues, they do not). The Late Charges/Interest section, however, is phrased in general terms. It applies where "MMM does not receive payment from the [Hospital] in accordance with the terms provided herein," *i.e.*, the terms provided in the Agreement. (*Id.* ¶ 5.7). One of the "terms" requiring "payment from the [Hospital]" is Agreement ¶ 4.3(b), which obligates the Hospital, within 30 days of termination, to pay MMM the cost of the initial inventory. I see no basis in the Agreement to distinguish between kinds of invoices for purposes of late fees and interest.

[13]  The December proposals projected almost $7 million in cost savings. The Hospital states that, in light of its early termination of the Agreement, that amount should be prorated at $6.2 million. The Hospital does not reveal how it calculated that prorated amount. A straight-line proration, for example, would produce a lower figure. The Agreement had a term of 3 years, or 1095 days. It actually ran from May 1, 2006 until December 4, 2008, or 948 days. $7 million x 948/1095 = $6.06 million.

Agreement to achieve a specific level cost savings, and I see none. MMM asserts that, because the Agreement contains a "merger" or "integration" clause, it would not be appropriate to infer from extrinsic evidence that the Agreement contained such a term. The Hospital replies that the December 7 and December 9 proposals can appropriately be used to resolve an ambiguity or to interpret the Agreement's more general provisions. In the Hospital's view, this extrinsic evidence establishes that the parties intended a contractual promise to achieve $7 million in cost savings over the three-year term of the Agreement.

A party claiming breach of contract must show that "the parties entered into a valid contract, that the [counterparty] failed to perform his obligations under the contract and that the [party claiming breach] sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265, 920 A.2d 678, 689 (App. Div. 2007). In general, "contracts are given their plain and ordinary meaning." *M.J. Paquet, Inc. v. N.J. Dept. of Transp.*, 171 N.J. 378, 396, 794 A.2d 141 (2002). "Where a contract is ambiguous, courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation; where the terms of a contract are clear, however, the court must enforce it as written." *County of Morris v. Fauver*, 153 N.J. 80, 103, 707 A.2d 958, 969 (1998). "If the language is plain and capable of legal construction, the language alone must determine the agreement's force and effect." *CSFB 2001-CP-4 Princeton Park Corporate Ctr., LLC v. SB Rental I, LLC*, 410 N.J. Super. 114, 120, 980 A.2d 1, 4 (App. Div. 2009). "A court has no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument." *E. Brunswick Sewerage Auth. v. E. Mill Associates, Inc.*, 365 N.J. Super. 120, 125, 838 A.2d 494, 497 (App. Div. 2004). However, "extrinsic evidence may be used to determine whether a contract is ambiguous" but not "to create an ambiguity where none exists." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999) (internal quotation and citations omitted).

"An ambiguous contract is one capable of being understood in more senses than one. Before it can be said that no ambiguity exists, it must be concluded that the questioned words or language are capable of only one interpretation." *In re New Valley Corp.*, 89 F.3d 143, 152 (3d Cir. 1996) (internal quotation and citation omitted). The steps involved in resolving a contractual ambiguity are as follows:

To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we hear the proffer of the parties and determine if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning. And once a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning.

*Id.* at 150.

Generally, and particularly where an agreement contains an integration or merger clause, the parol evidence rule "prohibits the introduction of evidence that tends to alter an integrated written document." *Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 901 A.2d 341, 346 (2006). The New Jersey Supreme Court, however, does not apply the parol evidence rule so strictly as to bar consideration of all extrinsic evidence for all purposes. *See Atl. N. Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 96 A.2d 652, 655–56 (1953). New Jersey law requires courts to "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract," which includes "a thorough examination of extrinsic evidence in the interpretation of contracts." *Conway*, 901 A.2d at 346. "Such evidence may include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." *Id.* (internal quotation marks and citations omitted). Where, as here, there is an integration clause, the general bar against using extrinsic evidence that is at odds with the contract retains its force:

The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of

modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said.

*Schwimmer*, 96 A.2d at 655–56. Accordingly, if the parol evidence "tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing," the court should exclude it. *Id.*

The Hospital does not claim that any guarantee of $7 million in cost savings is stated explicitly in any express language of the Agreement. Rather, it points to the preamble to the Agreement's list of services that MMM was to perform, which provides that such services are to be performed "[f]or the benefit of [the Hospital]." (Agreement § 1). This does not, in my view, rise to the level of an ambiguous expression, requiring interpretation, as to whether MMM's duties under the Agreement included a guarantee of $7 million in cost savings. Importation of the December Proposals' $7 million projection would not be an exercise in interpretation of the Agreement's words "for the benefit of"; rather, it would inject something "wholly unexpressed" in the Agreement.

The Hospital points to several facts in an effort to establish the need for extrinsic evidence or interpretation. As noted, the Agreement specifically lists services and states that they will be performed "for the benefit of" the Hospital. MMM's Regional Vice President stated in her deposition that "for the benefit of" means that such services will lead to some positive change or benefit. (Gutfeld Dep., Ex. D to Argiropoulous Cert., at 139:13-19). The Hospital reasons that because $7 million in savings would constitute such a "positive change," the December 9 Proposal's cost savings projections are part of the Agreement.[14] The Hospital also cites an email and deposition testimony of MMM's vice president of business development. (Ex. B to the Mendelowitz Cert. [ECF No. 61-4]; Grant Dep. 82:12-83:24, Ex. B to Argiropoulos Cert. [ECF No. 61-8]) These, the Hospital says, constitute an acknowledgement by MMM that the Hospital legitimately expected to receive such cost savings. *See also* Ex. C to Argiropoulos Cert. at CPS 2389 [ECF No. 61-8] (MMM's internal projection of $1.5 million in first-year savings).

The Hospital further suggests that, merger clause notwithstanding, the barrier between the December Proposals and the Agreement is porous. Thus, argues the Hospital, parts of the December 9 Proposal other than the $7 million projection are considered to be part of the Agreement. For example, certain services indisputably performed by MMM appear in the "Scope of

---

[14]    If nothing else, this argument embodies a formal logical fallacy.

Services" section of the December 9 Proposal but are absent from the Agreement. The Agreement, moreover, omits definitions of certain crucial terms, such as MMM's "Quality Assessment Process and Performance Improvement Program," and the "Purchasing Alliance for Clinical Therapeutics." Definitions of those terms may be found, however, in the December proposals.

I am not convinced that these arguments breach the wall that the merger clause has erected between the December Proposals and the Agreement:

First, the Hospital is a sophisticated entity that could have bargained for an express cost savings provision, but did not do so. A contractual guarantee of savings in the amount of $7 million, if intended, would be central and fundamental to the contract. The Hospital offers no explanation or evidence as to why the parties left out this key provision. The only explanation in the record is the commonsense one that it was not intended to be part of the Agreement.

Second, the Agreement provided for an incentive bonus to MMM if it lowered drug costs by $500,000 in 2006, the first year. (This provision, by the way, demonstrates that the parties knew how to include an explicit cost savings provision when they intended to.) The December 9 Proposal, however, projected much greater first-year savings of approximately $1.526 million. At oral argument, the Hospital stated that the yearly subtotals should be disregarded; the parties' agreement was to achieve $7 million in total savings over the Agreement's three-year term. [15] But the December 9 Proposal – the alleged source of this obligation – *does* state the savings year by year. The $7 million figure is

_____

[15]    As noted, the Hospital was forced into this position. First, if the obligation was only to achieve $7 million in savings by the final day of the contract, then MMM was not yet in breach of that obligation as of the date of termination. Second, the Agreement explicitly confers an incentive bonus upon MMM for realizing $500,000 in savings in the first year, 2006. If the Agreement were read, consistent with the December 9 Proposal, to require $1.526 million in first-year savings, then MMM's realization of $500,000 in first-year savings would have constituted a contractual breach that entitled it to a bonus -- an absurd result.

Reading a cost-savings promise into the Agreement might also require that the Court fashion ancillary terms that have no record support whatever. The Hospital portrays this as a simple obligation to save $7 million no matter what. Could it truly have been a promise to achieve $7 million in savings irrespective of, for example, the overall volume of pharmacy business? Such matters would no doubt have been negotiated if the Agreement had contained a cost savings provision -- but it did not.

apparently just the sum of the annual figures in the Proposal. Now the Hospital argues that it is this *post hoc* arithmetic calculation that is incorporated in the Agreement, to the exclusion of the *actual* figures in the December 9 Proposal.

Third, the December Proposals by their explicit terms expired as of December 31, 2005. The Agreement was not signed until March 23, 2006, and it took effect on May 1, 2006.

Fourth, the Hospital negotiated and signed a contract that contained a merger clause. That clause provided that the written Agreement itself "supersede[d] all prior or contemporaneous discussions, representations, correspondence and agreements, whether oral or written . . ." (Agreement § 5.16). Even accounting for the liberal approach of the New Jersey cases, such language at a minimum alerted the Hospital that it could not safely rely on any part of the December Proposals that did not make it into the written Agreement. That circumstance reinforces the general point that omitting a cost savings provision from the written Agreement, if one was intended, would simply have been irrational. As stated, the Hospital offers no evidence, or even an explanation, for such an omission.

Fifth, the Hospital reads too much into the general provision that listed services be provided "for the benefit of the Hospital." MMM was agreeing to perform services, not in general, or for the benefit of some third party, but for the Hospital. This language helped create a principal/agent relationship. But in any event this is the classic argument that proves too much. A party may contract to benefit another party without guaranteeing a specific level of savings. To be sure, the Hospital is "benefited" by saving $7 million (or $1 million, or $10 million). That is very different from saying that the contract silently guarantees $7 million in savings. This boilerplate phrase is not an empty vessel into which the Hospital may pour any obligation that would "benefit" itself.

Sixth, and finally, I am not convinced by the Hospital's argument based on MMM's performance of services that were described in the December 9 Proposal but not listed in Section 1.1 of the Agreement.[16] To

---

[16] The December 9 Proposal contains a section called "Scope of Services" that lists over forty services it would supply. Some are explicitly included in the Agreement, such as maintaining a unit dose of medication distribution, maintaining an IV admixture program, and maintaining pharmacy patient profiles. Others, however, were

begin with, it is not logically the case that if *anything* carried over from the December 9 Proposal, then *everything* must. That aside, it is not the case that, if unlisted services are part of the Agreement, they must have arrived there by osmosis from the December 9 Proposal. It is in the nature of a complex service contract that not every service will be listed. Many will be implied, and will arise simply by virtue of the complex set of tasks to be performed. By contrast, an unconditional commitment to realize $7 million in cost savings would not naturally be left to implication.

Viewing the evidence in light of the law of contractual interpretation, I cannot find a material issue of fact sufficient to overcome the plain language of this Agreement. I find no issue requiring trial as to the claim that MMM breached an unconditional contractual obligation to realize $7 million in cost savings over the three-year life of the Agreement. This is, of course, but one component of the Hospital's breach of contract claim. I find, however, that it is distinct and severable from the other claims of breach, sufficiently so that I may grant partial summary judgment in MMM's favor.[17]

---

not; these allegedly include, among others, providing sufficient implementation and interim staffing resources to complete all transition activities and commence operation on or before January 1, 2006; participating in BRMC's medication usage and infection control committee; completing monthly inspections of areas where pharmaceuticals are stored; and submitting monthly management reports and quarterly or semi-annual quality and business review reports. (Def. Facts ¶ 28).

The Hospital's claim, in any event, is exaggerated in certain respects. For example, the Hospital argues that the Agreement requires use of the PACT system but does not explain what that system is, making it necessary to consult the December 7 or December 9 Proposal. Such consultation, even if necessary, would not violate the merger clause of the parol evidence rule. It would be a fairly typical use of extrinsic evidence to clarify a term in a contract; indeed, it is not so different from consulting a dictionary. It does not imply that the terms of the pre-Agreement proposals are "incorporated" en masse into the Agreement, or that they can be used to impose additional duties on the parties.

[17]   Relatedly, the Hospital also counterclaims that MMM breached the implied covenant of good faith and fair dealing by "destroying the Hospital's right to receive the fruit of the Agreement – namely the millions in savings that MMM promised." (Hospital Summary Judgment Br. at 21 [ECF No. 61-6]). That covenant requires that neither party interfere with the other's ability to enjoy the fruits of the contract. *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001). The key element in demonstrating a breach of the implied covenant of good faith and fair dealing is bad motive. *Id.* at 251. When a dispute exists over "a subjective element such as intent," a court "should be

## 2. *Misrepresentation and Fraudulent Inducement*

The Hospital argues in the alternative that, if MMM's promise of cost savings was not a contractual promise, then it was a fraudulent representation, and that it induced the Hospital to enter into the Agreement.

To sustain a claim of fraud, or fraud in the inducement, the Hospital must show "(1) a material representation of a presently existing or past fact, (2) made with knowledge of its falsity and (3) with the intention that the other party rely thereon, (4) resulting in reliance by that party (5) to his detriment." *Jewish Ctr. of Sussex Cty. v. Whale,* 86 N.J. 619, 624 (1981). Such a showing must be made by "clear and convincing evidence." *Alexander v. CIGNA Corp.,* 991 F. Supp. 427, 435 (D.N.J. 1998). "Thus, to defeat a defendant's motion for summary judgment, a plaintiff must meet his or her 'burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud . . . .'" *Id.* (quoting *Moffatt Enterprises, Inc. v. Borden Inc.,* 807 F.2d 1169, 1174–75 (3d Cir. 1986)).

Only a limited category of statements constitute misrepresentations of present or past fact. In particular, statements about future profitability have repeatedly been held to fall outside of the category of actionable fraud:

> Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong. Similarly, statements that can be categorized as "puffery" or "vague and ill-defined opinions" are not assurances of fact and thus do not constitute misrepresentations. . . . *[S]ee also VT Investors v. R & D Funding Corp.,* 733 F. Supp. 823, 838 (D.N.J.1990) (statements that company in which plaintiffs invested would soon generate positive cash flow in excess of $60,000 per month characterized by court as non-actionable "puffery" because it was an emphatic statement of opinion); *see also Schott*

particularly hesitant" to grant summary judgment. *Carmichael v. Bryan,* 310 N.J. Super. 34, 47, 707 A.2d 1357, 1364 (App. Div. 1998); *see Lilliston,* 329 N.J. Super. at 324 (a finding of bad faith is a determination best left to the jury). This claim, however, seems to be nothing more than a repackaging of the Hospital's claim of breach of contract. Because I have found that the MMM's achievement of $7 million in cost savings is not legitimately regarded as a fruit of the Agreement, MMM's motion for summary judgment as to this cause of action is granted.

> *Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.,* 976 F.2d
> 58, 63–64 (1st Cir.1992) (court held that representations
> concerning a commitment to the motorcycle market and the future
> profitability of plaintiff's franchise were merely opinions of future
> events and could not be justifiably relied upon as "facts"); *Vaughn
> v. General Foods Corp.,* 797 F.2d 1403, 1411 (7th Cir.1986) (court
> rejected a franchisee's efforts to sustain a claim for fraudulent
> non-disclosure against its franchisor, based on the latter keeping
> confidential its intention to divest its unprofitable Burger Chef
> operations, while representing that it intended to build operation
> into a fast food contender).

*Alexander,* 991 F. Supp. 427, 435 (D.N.J.1998) (some internal quotations and
citations omitted) ("in order to constitute a fact, a statement's content must be
susceptible of exact knowledge at the time it is made."). However, "included
within the first element are promises made without the intent to perform since
they are material misrepresentations of the promisor's state of mind at the time
of the promise." *Bell Atl. Network Servs., Inc. v. P.M. Video Corp.,* 322 N.J.
Super. 74, 95-96, 730 A.2d 406, 417 (App. Div. 1999).

To establish fraud, the Hospital must walk a fine line. The economic loss
doctrine precludes tort claims where the allegedly tortious conduct is intrinsic
to the contract – *i.e.,* where the alleged tort consists of the breach of a
contractual promise or provision:

> The distinction between fraud in the inducement and fraud in the
> performance of a contract remains relevant to the application of
> the economic loss doctrine in New Jersey. Courts have continued
> to affirm the conceptual distinction between a misrepresentation of
> a statement of intent at the time of contracting, which then
> induces detrimental reliance on the part of the promisee, and the
> subsequent failure of the promisor to do what he has promised.

*Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.,* 226 F. Supp. 2d 557, 563
(D.N.J. 2002) (internal quotation omitted). *See Gleason v. Norwest Mortgage,
Inc.,* 243 F.3d 130, 144 (3d Cir. 2001) ("The New Jersey District Courts still
hold that fraud claims not extrinsic to underlying contract claims are not
maintainable as separate causes of action."). The Hospital claims, on the one
hand, that the cost savings target of $7 million was part of the Agreement, and
sues for breach of contract; it claims, on the other hand, that this was an

independent fraudulent misrepresentation. The Hospital acknowledged at oral argument that the contract and tort claims are alternatives.[18]

The parties disagree as to whether MMM's statements about cost savings were actionable, false representations of fact. The Hospital contends that these were not mere predictions or promises. Rather, the Hospital says, they were false representations of MMM's existing intentions in December 2005.

> [A] false representation of an existing intention, i.e., a "false state of mind," with respect to a future event or action has been held to constitute actionable misrepresentation. . . . In other words, the defendant must have no intention at the time he makes the statement of fulfilling the promise. Defendant's lack of intention may be shown circumstantially by his subsequent acts and by subsequent events or by evidence that the statement was impossible to fulfill based upon contingencies or circumstances known to the promisor at the time of the statement but unknown to the promisee.

*Capano v. Borough of Stone Harbor*, 530 F. Supp. 1254, 1264 (D.N.J. 1982).

The major false statement, says the Hospital, was the financial and operational assessment that MMM conducted, as reflected in the December 7 and December 9 Proposals. That financial assessment projected savings of $1,526,140 in year one, $2,324,983 in year two, and $3,094,945 in year three.[19] The Hospital's legitimate expectations were reinforced, it says, by an email from MMM "offering to bring [the Hospital] $1.5M in savings [in year one]. . . [which] is hugely significant." (Mendelowitz Cert., Ex. B). That email went on to say that some of those first-year savings would be earmarked for a regulatorily required upgrade of the Pharmacy.

I find no evidence, however, that MMM contemporaneously knew it could not achieve such cost savings, or that it did not intend to try. Indeed, if MMM did not intend to realize such savings, there would be little sense in pledging them to finance physical upgrades. Nor does MMM's performance of the

---

[18]    That circumstance does not require the Court to dismiss one or the other. Pleading in the alternative is permissible. Fed. R. Civ. P. 8(d). Whether to present inconsistent theories to a fact finder is a tactical issue, not a legal one.

[19]    These figures are from the December 9 Proposal. The figures in the December 7 Proposal are similar.

Agreement (which admittedly produced $4.6 million in savings) suggest that it had no intention of honoring this representation.

As to MMM's knowledge of falsity, the Hospital finds it suspicious that MMM did not explain in detail how it arrived at the cost savings figures or set up any metric of its compliance with the Agreement. To me, that lack of detail only confirms that these were normal financial estimates – precisely the kind of representations held to be not actionable as a matter of law. *See, e.g., Alexander,* 991 F. Supp. at 435. A sophisticated party like the Hospital surely knows that businesses make such projections all the time, and are not properly called liars if and when the results fall short. It might even be assumed *arguendo* that MMM breached a contractual duty to manage the Pharmacy prudently, and that shortfalls in savings *resulted*; that, however, is a breach of contract, not a case of fraud. (Claims of breach of specific contractual provisions are discussed In Section III.C, below.)

MMM cites testimony of the Hospital's Chief Operating Officer, who does not believe that MMM's vice president of business development lied or intentionally made any misrepresentations to her. That is good as far as it goes, but I am mindful that "[p]roof of intent is difficult, subjective and always a matter of inference." *Lilliston Chrysler Plymouth Dodge Truck Jeep Eagle, Inc. v. Universal Underwriters Group,* 329 N.J. Super. 318, 324 (App. Div. 2000). "A summary judgment motion should not ordinarily be granted when an action or defense requires determination of a state of mind or intent, such as claims of waiver, bad faith, fraud or duress." *Id.*; *see also Shebar v. Sanyo Business Systems Corp.,* 111 N.J. 276, 291 (1988). Thus any substantial evidence to the contrary might have created a triable issue of fact. But I see no positive evidence that MMM misrepresented a currently existing fact in December 2005, when it was negotiating this contract with the Hospital.[20]

---

[20]     Because I find no actionable false statement of fact, I need not reach the reliance issue, but I note the following for the sake of completeness. The parties differ over whether the Hospital relied reasonably (or relied at all) on the cost savings projections when it entered into the Agreement in March 2006. MMM points out (1) that the December 7 and December 9 Proposals expired by their terms on December 31, 2005, months before the Agreement was signed; (2) that the Agreement contains an integration clause; (3) that the Hospital's officers reviewed the Agreement before signing it; and (4) that the Agreement's fee structure was not based on any alleged commitment to achieve $7 million in savings. To put it another way, if the Hospital was relying on these statements in signing the Agreement, why are they not part of the Agreement? A sophisticated business entity would not reasonably interpret projections

In establishing its claim, the Hospital faces a high bar – proof by clear and convincing evidence. And that high standard of proof informs the summary judgment analysis. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[W]e conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at . . . [the] summary judgment stage[]. Consequently, where the . . . "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant.").

I find no genuine issue of material fact when I view the evidence in light of the burden of proof and the governing legal standards. I will therefore grant partial summary judgment in favor of MMM on the Hospital's fraud counterclaims.

C.   The Hospital's Counterclaims Asserting Deficient Performance

The remaining components of the Hospital's counterclaim are of a different character. Here, the Hospital points to reasonably specific standards that a professional pharmacy manager would be expected to meet, and alleges that MMM failed to meet them, thereby breaching the Agreement. They fall into two categories: first, that MMM did not properly manage the Pharmacy's inventory, and second, that MMM did not adjudicate prescription benefits claims appropriately. For the reasons stated in this section, those counterclaims present material issues sufficient to permit them to go to a fact finder. As to these components of the counterclaims only, I will deny both sides' motions for summary judgment. I discuss this aspect of the motions only briefly; the citation of triable issues sufficient to defeat summary judgment should not necessarily be taken as an exhaustive list of issues to be tried.

---

as guarantees and, having failed to incorporate them into the ultimate Agreement, the Hospital could not reasonably have interpreted them as such.

On the Hospital's side of the ledger, however, are such items as the admission of MMM's vice president of business development, Kendra Grant, that the Hospital came to expect that it would receive the savings outlined in MMM's proposal. The case for reasonable reliance is weak, although, on a charitable view, there could be a triable issue.

1.  *Deficient management of the Pharmacy*

MMM first argues that MMM breached the Agreement by failing to appropriately manage the Pharmacy's inventory. There are four sub-parts to this claim: MMM did not turn over the inventory frequently enough; pharmaceutical drugs expired at an excessive rate; MMM did not purchase the least expensive drugs available; and MMM relied on the Supply Management Ordering ("SMO") platform to purchase drugs without checking if it yielded the lowest prices. Currently it appears to me that these sub-parts are interrelated, and should be considered together when assessing whether MMM breached the Agreement.

The Agreement required MMM to "order and maintain an inventory of Drugs on behalf of [the Hospital] appropriate for the operation of the Pharmacy and to meet the requirements of [the Hospital]'s Medical Staff . . . ." (*Id.* § 1.5(b)). The term "appropriate" may incorporate a variety of requirements, especially (a) in the case of a complex contract that requires services at a professional level over an extended period of time and (b) where the party providing the services has held itself out as a skilled expert in some field. *See generally* Restatement (Third) of Agency § 8.08 (2006) ("If an agent claims to possess special skills or knowledge, the agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents with such skills or knowledge.") MMM represented that it was a supplier of professional-level pharmacy management services; accordingly, such professional standards may shed light on what "appropriate" performance of the contract might consist of. (December 9 Proposal at 3; Def. Facts ¶ 10). In short, what is "appropriate" presents a factual issue that is not resolved by the present record.

The Hospital claims that MMM did not maintain an adequate inventory turn rate, defined as the number of times a pharmacy replaces its inventory annually. (Def. Facts ¶ 66). There is evidence that an appropriate rate for a hospital pharmacy is 12 to 15 inventory turns per year.[21] (*Id.* ¶¶ 67, 68). The Hospital's auditor states that MMM's average annual turn rate was 9.2, a decline from its predecessor's rate of 10.6.[22] (*Id.* ¶¶ 70, 71). MMM disputes the

---

[21]     At oral argument, counsel for MMM stated that the appropriate turn rate for each hospital pharmacy is unique, and that 12 to 15 might not be the right number for the Hospital's pharmacy. The appropriate standard will be for a fact finder to decide. MMM adds that damages on this point are minimal, because even if there had been insufficient turnover, the excess inventory would have retained monetary value.

validity of this statistic because, *inter alia,* it includes the inventory MMM inherited when it took over the Pharmacy. (Pl. Counter-Facts ¶ 71 [ECF No. 63-2]). There is enough here to create a genuine issue of material fact.

Relatedly, the Hospital alleges that MMM mismanaged the inventory, resulting in excessive levels of expired (and therefore unusable) drugs. A third-party audit found that from May 2006 through April 28, 2008, the value of expired pharmaceuticals was $200,592.17. (Argiropoulos Cert., Ex. R). From this figure, the Hospital calculates an expired drug quotient of 1.48%; according to one expert, effective management should generally yield a rate of no more than 1%. (Schwartz Cert., Ex. H at 5 [ECF No. 64-2]). The 1.48% figure, however, is vulnerable in that it incorporates figures from disparate time periods. Further, some portion of the expired drugs may have been inherited when MMM took over the Pharmacy. Such disputed issues – and the need to assess MMM's performance in the factual context of a three-year relationship -- prevent this claim component from being disposed of on summary judgment.

The Hospital next argues that the contractual provision requiring MMM to maintain an inventory of drugs "appropriate" for the Pharmacy implies a duty to purchase the least expensive drugs available. (Agreement § 1.5(b)). MMM's representative acknowledged a duty to purchase drugs at the lowest cost possible "as best [they] could." (Argiropoulos Cert., Ex. D, Gutfield Dep., at 165:23-166:5). That could have a number of meanings. More fundamentally, that "lowest cost" duty potentially conflicted with another section of the Agreement that obligated MMM to order drugs using the Purchasing Alliance for Clinical Therapeutics ("PACT"). (Agreement § 1.5(c)). Here, the Agreement is at least potentially ambiguous, and its interpretation raises issues of fact.

The Hospital points to MMM's performance of the contract as evidence of its meaning. Thus, according the Hospital, MMM purchased drugs not only through PACT, but also through other vendors. (*See* invoice from ASD Specialty Healthcare, Gutfield Cert., Ex. B at MMM 11963.) The Hospital urges that using Novation for the inpatient pharmacy's pharmaceuticals would have saved

---

[22]   Counsel for the Hospital explained at oral argument why the turn rate was too low. MMM inherited inventory from CPS and maintained it at the same levels, which were too high. What MMM should have done, says the Hospital, was to let the existing inventory run down to more appropriate levels, instead of just replacing it. The record does not seem to yet contain the proofs that would quantify the Hospital's claim.

over $100,000. (Schwartz Cert., Ex. J). Enrollment in the 340B PVP program, too, allegedly would have entitled it to lower drug prices.[23]

MMM responds in a few ways. First, it points to the Agreement's explicit provision that MMM not only may but must use PACT. (Agreement § 1.5(c)). Second, even choosing the "least expensive" vendor involves considerations other than raw cost, including rebates and educational benefits. Third, the Hospital's auditor used a flawed methodology to determine that participating in the 340B PVP would have saved money. The claim of 12% savings (Def. Facts ¶ 61), for example, related to 2011; the savings, if any, available in 2006 are unknown. (Pl. Counter-Facts ¶ 61). At oral argument, counsel for MMM stressed that drug prices fluctuate, and that spot checking will not reveal whether, over the term of this Agreement, MMM met its obligations. This, too, appears to be a judgment call for a fact finder.

Next the Hospital claims that MMM breached the Agreement by blindly relying on the Supply Management Ordering ("SMO") system. The SMO system, according to the Hospital's outside auditor, did not yield the lowest available prices, and as a result the Hospital lost revenue of $200,000. (Schwartz Cert., Ex. K). MMM responds that the use, or not, of SMO is not dictated by the Agreement, and that, if the Hospital believes SMO was deficient, it should pursue a claim against the licensor of the SMO system, McKesson Corporation. MMM also attacks the Hospital's calculation, via extrapolation, of the $200,000 lost revenue figure. And this part of the claim also depends on the disputed scope of the duty to purchase drugs at the lowest price.

What all of this indicates is that genuine issues of material fact exist as to, for example: (1) whether the Agreement's provisions required PACT to be the exclusive drug provider; (2) the meaning and contours of any obligation to use the least expensive source; and (3) whether the use of the 340B PVP, SMO or some other reasonably available program or vendor was required, or would have saved the Hospital money, over the course of the Agreement. I will deny both sides' motions for summary judgment on the Hospital's counterclaim for breach of contract as it relates to the allegedly deficient management of the Pharmacy.

---

[23]     In May 2007, the Hospital's outside auditor, not MMM, enrolled the Hospital in the 340B PVP. (Def. Facts ¶ 58).

2.     *Deficient claims adjudication and filling of prescriptions not approved by insurers*

The Hospital's next argument is that MMM adjudicated claims improperly and filled prescriptions that were not approved by the patients' insurers, and that as a result the Hospital was not compensated.

"Claims adjudication is the process by which the Pharmacy is paid for the medication it dispenses. It involves filing a claim with third-party payors – including Medicare, Medicaid and private insurers." (Def. Facts ¶ 42). "If a claim is not properly adjudicated, then the Hospital will not be paid for medication it dispenses." (*Id.* ¶ 43). As amended effective October 2006, the Agreement required MMM to adjudicate all prescriptions. (Amendment No. 1 to Agreement, Ex. F to Argiropoulous Cert. [ECF No. 61-9] (MMM was to "[o]versee the billing function, on behalf of the hospital, for third party insurance carriers (including Medicaid) for services provided to patients in conformity with the usual and proper method required or accepted under the respective reimbursement or payment plans.")). The parties do not contend that this provision is ambiguous.

Around July 16, 2006, the Hospital acquired software that enabled it to submit outpatient pharmacy claims to Medicare Part D, Medicaid, and private insurers for instant approval or denial. (Schauble Cert. ¶¶ 10, 11, 13 [ECF No. 64-5]). With this software in place, the Hospital allegedly instituted a policy that no prescription should be filled unless its reimbursement was approved in advance, the patient qualified for charity care, or the patient paid cash. (*Id.* ¶ 12).   Because the software would quickly alert the outpatient pharmacy whether the claim was approved or denied, the Hospital alleges, it should have been compensated on nearly every prescription filled by the outpatient pharmacy (aside from the charity cases). (*Id.*).

MMM is alleged to have nevertheless filled prescriptions that were not approved by insurers. (Def. Facts ¶ 50). The Hospital identified 8,024 prescriptions, dating from July 16, 2006 through December 31, 2007, that were filled by MMM but not covered by third-party payors.[24] (Schauble Cert. ¶ 19). To determine whether these unpaid claims resulted from MMM's mistakes, the Hospital sampled about 20% (1,653) of those 8,024 claims and found that

---

[24]     At oral argument, CPS's counsel stated that over the length of the Agreement, MMM filled approximately 250,000 prescriptions. The 8,024 figure represents prescriptions for which the Hospital was not reimbursed. The remaining 242,000 prescriptions were properly paid for and thus caused no loss to the Hospital.

about 90% of these were improperly adjudicated. (Schauble Cert. ¶¶ 19-24).[25] Extrapolation of that 90% error rate to all of the 8,024 uncompensated prescriptions yields 7,462 improperly adjudicated claims with a combined value of about $1.66 million.[26] (Schauble Cert. ¶¶ 20, 24). The Hospital's share of such claims (and therefore its loss) is 35%, which yields a loss calculation of $580,000.[27] (Schauble Cert. ¶¶ 13, 22-24; Def. Facts ¶ 50).

MMM responds that the Hospital failed to confirm whether it had contracted with various insurers, a lapse for which MMM should not be held responsible. The Hospital replies that the software would have shown a denial of claims with insurers with which it had no contract. MMM disputes that the alleged policy requiring verification of applicable insurance in advance of filling any prescription is part of the Agreement. In addition, MMM objects to the sampling methodology, based on the lack of expert testimony about sampling or extrapolation of results. Further, the Hospital essentially claims a contractual entitlement to an adjudication error rate of zero; whether that is the standard under the Agreement presents an issue of fact.

I find that multiple genuine issues of material fact exist as to the Hospital's claim based on the alleged improper adjudication of prescriptions. For this reason, too, I will deny both sides' motions for summary judgment on the Hospital's counterclaim for breach of contract.

---

[25]    The Hospital conducted two analyses, each of which contained a unique 10% sample of the total number of claims. One analysis occurred in early 2008 and the other in May 2011. (Schauble Cert. ¶ 19).

[26]    The early 2008 and May 2011 samples found that the extrapolated amount of unpaid prescriptions, respectively, would total $1,689,160 and $1,628,192. The $1.66 million figure above is roughly the mid-point of these two figures.

[27]    The early 2008 sample calculated this amount as $591,206 and the same figure from the May 2011 sample was $569,867. Again, the number cited above is approximately midway between these figures.

## IV.   CONCLUSION

For the reasons stated above, the motion of plaintiff, CPS MedManagement LLC ("MMM"), for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and the motion of defendant, Bergen Regional Medical Center, L.P. (the "Hospital"), for summary judgment is **DENIED**, as follows:

(1) *MMM's Motion for Summary Judgment on its own claims.*

(a) MMM's Motion for Summary Judgment is **GRANTED** as to the First and Third Counts of the complaint, which allege causes of action for breach of contract and book account based on five unpaid invoices. Entry and execution of judgment, however, are hereby stayed pending resolution of the Hospital's outstanding claims.

(b) MMM's Motion for Summary Judgment is **DENIED AS MOOT** as to the Fourth Count of the complaint, which alleges unjust enrichment.

(c) MMM's Motion for Summary Judgment is **DENIED WITHOUT PREJUDICE** as to the Fifth Count of the complaint, which seeks attorneys' fees and expenses. The parties may make an application at the appropriate time. *See* Section III.A, *supra.*

(2) *MMM's Motion for Summary Judgment on the Hospital's Counterclaim.*

(a) MMM's Motion for Summary Judgment is **GRANTED** as to Counts I, II, III, and IV of the Hospital's Counterclaim for breach of contract, misrepresentation, breach of the implied duty of good faith and fair dealing, and fraudulent inducement, insofar as they are based on MMM's failure to deliver cost savings of $7 million over the term of the Agreement. *See* Sections III.B.1 & III.B.2, *supra.*

(b) MMM's Motion for Summary Judgment is **DENIED** as to Count I of the Hospital's Counterclaim for breach of contract, insofar as it is based on MMM's allegedly deficient management of the Pharmacy's inventory and adjudication of claims. *See* Section III.B.3, *supra.*

(3) *The Hospital's Motion for Summary Judgment on its own Counterclaims.*

The Hospital's Motion for Summary Judgment is **DENIED** in its entirety.

(4) *The Hospital's Counterclaim for negligence* (Count V of the Counterclaim) is voluntarily **DISMISSED WITHOUT PREJUDICE**.

An appropriate order follows.

KEVIN MCNULTY
United States District Judge

Dated: April 4, 2013